SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
POLLY TOWILL, Cal. Bar No. 120420
  ptowill@sheppardmullin.com
ANDRE J. CRONTHALL, Cal. Bar No. 117088
  acronthall@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone: 213.620.1780
Facsimile:  213.620.1398

Attorneys for Respondent
BofI FEDERAL BANK

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| AURELIUS, an individual,<br><br>                    Petitioner,<br><br>          v.<br><br>BofI FEDERAL BANK,<br>a federal savings bank,<br><br>                    Respondent. | Case No. 2:16-mc-71<br><br>**BOFI FEDERAL BANK'S OPPOSITION TO AURELIUS' MOTION TO QUASH THE SUBPOENA ISSUED TO CENTURYLINK COMMUNICATIONS, LLC**<br><br>Assigned to the Hon. Frederick F. Mumm<br><br>Date:      July 5, 2016<br>Time:      10:00 a.m.<br>Courtroom:   580<br><br>*[Filed concurrently with BofI's Notice of Interested Parties and Towill Declaration In Support Of Opposition to Motion to Quash Subpoena to CenturyLink; [Proposed] Order lodged concurrently herewith]* |

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION AND BRIEF OVERVIEW.................................................1

II.  STATEMENT OF FACTS.........................................................................5

    A.   BofI's Complaint In The Underlying Action And The TRO. ...................5

    B.   BofI Uncovers Evidence That Gillam Has Disseminated BofI's
        Confidential Information To Short Sellers .............................................7

    C.   Short Seller "Aurelius" Appears To Be In On The Scheme To "Short And
        Distort" BofI's Stock. .........................................................................9

    D.   BofI's Current And Former Attempts To Discover Aurelius' Identity......12

III. LEGAL STANDARDS APPLICABLE TO A MOTION TO QUASH ...........14

IV.  AURELIUS HAS FAILED TO COMPLY WITH THE MANDATORY RULES
    SET FORTH IN LOCAL RULES 37-1 AND 45-1 .......................................15

V.   THE COURT SHOULD DENY AURELIUS' MOTION TO QUASH THE
    SUBPOENA ..........................................................................................16

    A.   Aurelius' Identifying Information Is Highly Relevant To BofI's Claims. .16

    B.   The First Amendment Does Not Weigh In Favor Of Preserving Aurelius'
        Anonymity. ........................................................................................17

        1.   Aurelius' Blog Postings Are Misleading Commercial Speech And Are
            Not Entitled To First Amendment Protections. .................................18

        2.   Even If The Court Concludes That Aurelius' Blog Postings Are Not
            Misleading Commercial Speech, BofI Has Satisfied The *2TheMart*
            Factors For Discovering Aurelius' Identity........................................22

VI.  CONCLUSION .....................................................................................25

-i-
                                 Case No. 2:16-mc-71
SMRH:477893904.3   BOFI'S OPPOSITION TO AURELIUS' MOTION TO QUASH THE SUBPOENA ISSUED TO
                                                   CENTURYLINK

# TABLE OF AUTHORITIES

Page(s)

Cases

*Alvis Coatings, Inc. v. John Does One Through Ten*
   2004 U.S. Dist. LEXIS 30099 (W.D.N.C. 2004) ..........................................21

*In re: Anonymous Online Speakers*
   661 F.3d 1168 (9th Cir. 2011)...................................................... 14, 18, 22

*Blankenship v. Hearst Corp.*
   519 F.2d 418 (9th Cir. 1975) ....................................................... 14

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Commc'n*
   447 U.S. 557 (1980) ..............................................................19, 20

*Directv, Inc. v. Trone*
   209 F.R.D. 455 (C.D. Cal. 2002).................................................. 14

*Doe v. 2TheMart.com Inc.*
   140 F. Supp. 2d 1088 (W.D. Wash. 2001) ................................1, 18, 22, 23, 24

*Exxon Shipping Co. v. U.S. Dep't of Interior*
   34 F.3d 774 (9th Cir. 1994) ....................................................... 14

*Fanning v. FTC*
   2016 U.S. App. LEXIS 8519 (1st Cir. 2016)....................................... 21

*Friedman v. Rogers*
   440 U.S. 1 (1979)................................................................ 21

*Highfields Capital Mgmt., L.P. v. Doe*
   385 F. Supp. 2d 969 (N.D. Cal. 2005)......................................... 1, 22

*Mount Hope Church v. Bash Back!*
   705 F.3d 418 (9th Cir. 2012) ..................................................... 18

*Perry v. Schwarzenegger*
   591 F.3d 1147 (9th Cir. 2010)..................................................... 14

*Virginia Pharmacy Bd. v. Virginia Consumer Council*
   425 U.S. 748 (1976) ............................................................. 20

<u>Other Authorities</u>

Fed. R. Civ. P. 26(b)(1) ............................................................................ 4, 14, 16

Fed. R. Civ. P. 45 .......................................................................................14, 18

Fed. R. Civ. P. 45 (a), (b).................................................................................. 14

Local Rule 37.................................................................................................... 15

Local Rule 37-1................................................................................................ 15

Local Rule 37-2.2............................................................................................. 15

Local Rule 37-2.4........................................................................................ 4, 15

Local Rule 45-1................................................................................................ 15

Local Rules 37 and 45-1 .....................................................................................4

Local Rules 45-1 and 37.................................................................................... 15

Rule 26 ............................................................................................................. 14

SMRH:477893904.3   BOFI'S OPPOSITION TO AURELIUS' MOTION TO QUASH THE SUBPOENA ISSUED TO CENTURYLINK

Respondent BofI Federal Bank ("BofI") submits this Opposition to the Motion to Quash BofI's subpoena (the "Subpoena") on CenturyLink Communications, LLC ("CenturyLink") filed by Petitioner "Aurelius."

## I.

## INTRODUCTION AND BRIEF OVERVIEW

In the Ninth Circuit, anonymous internet speech is entitled to varying degrees of protection under the First Amendment. Some speech—such as political, religious, or literary speech—is entitled to an exacting, nearly insurmountable degree of First Amendment protection. Other speech—such as commercial speech—enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values. "Aurelius'" speech—a litany of postings motivated by financial gain and containing misleading and possibly unlawful information by a known short seller—is entitled to no First Amendment protections. Even if the Court concludes that Aurelius' blog postings are not misleading commercial speech and are therefore entitled to some First Amendment protection, BofI has satisfied even the most stringent test set forth in the Ninth Circuit for discovering the identity of anonymous speakers. BofI has satisfied the factors set forth in *Doe v. 2TheMart.com Inc.,* 140 F. Supp. 2d 1088, 1095 (W.D. Wash. 2001), the standard advocated by Aurelius in his motion to quash.[1] As explained below, the Court should deny the motion to quash and allow BofI to obtain highly relevant discovery from Aurelius so that it may pursue its claims in the Underlying Action.

BofI issued a subpoena to CenturyLink (the "Subpoena") to obtain the identity of Aurelius in connection with litigation in the U.S. District Court for the Southern District of California, Case No. 3:15-cv-02353-BAS-NLS (S.D. Cal.) (the

---

[1] Given the commercial nature of Aurelius' speech, BofI believes the lower standard articulated in *Highfields Capital Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969 (N.D. Cal. 2005) arguably applies. *See infra*, V.B.2.

"Underlying Action").  In the Underlying Action, BofI sued a former junior auditor employed in its internal audit department, Charles Matthew Erhart ("Erhart") for various causes of action arising from Erhart's theft and dissemination of BofI's confidential, privileged and proprietary information.  After Erhart had stolen BofI's information, he filed a "whistleblower" action against BofI which itself contained highly confidential information.  Further, even before the complaint became publicly available on PACER, through his attorney Carol Gillam ("Gillam"), Erhart leaked his complaint riddled with BofI's confidential information to *The New York Times*.

It is undisputed that Erhart and Gillam improperly accessed and then disclosed BofI's confidential information.  Erhart freely admitted during his deposition that he took BofI's information.  And, BofI's principal regulator, the Office of the Comptroller of Currency (the "OCC"), has recognized that even Erhart's complaint improperly discloses confidential regulatory communications and has demanded that BofI take steps to stop Erhart's improper leaks of BofI's confidential information.

Enter Aurelius.  *Seeking Alpha* is an investment blog where anonymous "investors" (including short sellers) post articles designed to affect the price of publicly traded securities.  After Erhart's and Gillam's leak to *The New York Times*, BofI began to monitor media outlets, including *Seeking Alpha*, to investigate whether Erhart or Gillam had continued to leak BofI's confidential information in their possession to other sources.  Starting on October 20, 2015 and continuing through the present, an anonymous author identified by the pen name of "Aurelius" has posted on *Seeking Alpha's* website a series of highly misleading, and increasingly sensational, negative blogs regarding BofI containing information that appears to originate from an inside source.  Aurelius' blog postings are motivated by money -- he is a confessed short seller and stands to profit from any declines in

1    BofI's stock price.[2]

2    Given the timing of Aurelius' blog blitz, BofI became concerned that Erhart

3    or Gillam may have been in contact with Aurelius, feeding him the confidential

4    inside information that formed the basis for his blogs.  BofI also had a suspicion that

5    its stock was the subject of a coordinated "short attack" by short sellers.[3]  As a

6    result of its suspicions, in conjunction with subpoenaing Erhart's counsel, BofI tried

7    to subpoena Aurelius by subpoenaing *Seeking Alpha* for his identity.[4]  BofI lost this

8    previous motion to compel *Seeking Alpha* because it had not yet uncovered evidence

9    to support its theory that Erhart was disseminating the information as part of an

10   active short seller conspiracy to distort the market for BofI's stock.

11   BofI now has the needed evidence.  The court ordered Erhart's attorney in the

12   Underlying Action, Gillam, to produce documents reflecting communications with

13   third parties regarding BofI.  Confirming BofI's suspicions, Gillam produced

14   numerous documents showing that for months prior to having filed Erhart's

15   whistleblower action, she had coordinated with Peter Eavis of *The New York Times*

16   ("Eavis") regarding Erhart's claims against BofI.  Further, Gillam's documents

17   showed that she sent copies of Erhart's whistleblower action to short sellers,

18   including hedge funds and other speculators.  In those communications, Gillam

19   gloated about the hundreds of millions of dollars in lost market capitalization BofI

20   suffered after the filing of the Erhart action.  There was no legitimate reason for

---

22   [2]   BofI does not know whether Aurelius is male or female.  For convenience,
      BofI will use masculine pronouns when referring to Aurelius.

23
24   [3]   A "short and distort" scheme is an "[a]n illegal practice employed by
      unethical internet investors who short-sell a stock and then spread
25    unsubstantiated rumors and other kinds of unverified bad news in an attempt
      to drive down the equity's price and realize a profit."  *See* http://
26    www.investopedia.com/terms/s/shortanddistort.asp#ixzz4ATnicpyb

27   [4]   Due to Gillam's apparent involvement with leaking information, BofI issued a
      subpoena for documents to Gillam.  *See infra*, II.B.

28

Gillam to call on short sellers regarding Erhart's employment related claims against BofI. A reasonable inference is that Erhart and Gillam were part of the short seller conspiracy to manipulate BofI's stock price.

Given the timing and misleading nature of Aurelius' blog postings, BofI has a reasonable suspicion that Aurelius is part of the short seller conspiracy to "short and distort" the market for BofI stock. BofI also reasonably suspects that Aurelius was given access to BofI's confidential information or, at a minimum, that his "investigations" (*i.e.* hit-pieces) were directed by Gillam or Erhart.[5] Parties may obtain discovery regarding "any nonprivileged matter that is relevant to any party's claim or defense" so long as it is proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). Here, BofI has the right to pursue and obtain discovery from Aurelius that is highly relevant to its claims.

As a result of prior investigatory efforts, BofI was able to trace Aurelius' Internet Protocol address ("IP Address") to CenturyLink and subpoenaed CenturyLink to obtain Aurelius' identifying information. CenturyLink was ready to comply with the Subpoena; but on the date of compliance, Aurelius filed his motion to quash the Subpoena. The Court should deny Aurelius' motion and allow BofI to obtain highly relevant and probative discovery from Aurelius.

As a preliminary matter, Aurelius' motion to quash is dead on arrival because it fails to comply with Local Rules 37 and 45-1. These rules require all discovery motions to be submitted in the form of a Joint Stipulation. In addition, Aurelius' counsel was required to (but did not) meet and confer in person with BofI's counsel prior to the filing of the motion to quash the Subpoena. Local Rule 37-2.4 is crystal clear: The Court shall "*not consider any discovery motion [that fails to comply with the applicable Local Rules.]*" Accordingly, the Court should deny Aurelius' motion to quash on this basis alone.

---

[5] Indeed, Erhart and/or Gillam themselves could very well be Aurelius.

Aurelius' motion to quash the Subpoena is also substantively defective.  It is based entirely on purported First Amendment protections for anonymous internet speech.  But the First Amendment does not protect misleading or unlawful commercial speech like Aurelius'.  Even if the Court concludes that Aurelius' anonymity is entitled to some measure of First Amendment protection, such protections are not absolute.  Here, BofI has satisfied the applicable Ninth Circuit standards for discovering the identity of anonymous speakers.

Accordingly, for the reasons set forth in this Opposition, the Court should deny Aurelius' motion to quash and permit BofI to obtain Aurelius' identifying information from CenturyLink.

## II.

## STATEMENT OF FACTS

**A.    BofI's Complaint In The Underlying Action And The TRO.**

On September 23, 2013, Erhart commenced his employment at BofI as a Staff Internal Auditor.  (*See* Request for Judicial Notice In Support of Motion to Quash Subpoena Issued to CenturyLink Communications, LLC [Dkt. #2] ("RJN") Ex. B ¶ 7.)  During the course of his employment, Erhart had access to BofI's confidential, proprietary, and privileged information.  (*Id.* Ex. B ¶ 11.)  As an employee in the banking and finance industry, Erhart was under regulatory obligation to preserve BofI's confidential information.  (*Id.* Ex. B ¶¶ 15, 17.)  In addition, Erhart entered into several agreements with BofI where he agreed to safeguard BofI's confidential information (including the confidential information of its customers).  (*Id.* Ex. B ¶¶ 16, 18-21.)

Between January 13, 2015 and March 11, 2015, Erhart surreptitiously converted large amounts of BofI's confidential information, including (i) information containing BofI's intellectual property; (ii) confidential and proprietary information belonging to BofI, its employees, its business counterparties, and/or its clients (including BofI's customer's private banking information); and (iii)

information containing the non-public personal information of BofI employees, business counterparties, and clients.  (*Id.* Ex. B ¶¶ 11, 30-39.)  Contrary to Erhart's claim that he was fired, Erhart inexplicably went on medical leave on March 5, 2015, exhausted his medical leave on May 15, 2015, and was effectively terminated on June 9, 2015 for failure to return.  (*Id.* Ex. B ¶¶ 40-41.)  In fact, his own attorney, Gillam, confirms in an email to Eavis that Erhart went on leave and never returned. (Declaration of Polly Towill ("Towill Decl.") ¶ 11, Ex. 6 at TGLF000014.)

On October 13, 2015, Erhart, through Gillam, publicly disclosed BofI's confidential information to Eavis of *The New York Times*.[6]  BofI's stock thereafter plummeted by 30.2% in a single day (representing hundreds of millions of dollars in lost market capitalization).  (*Id.* Ex. B ¶ 46.)  That same day, Erhart also filed a complaint against BofI alleging (among other things) that he was retaliated against for being an alleged whistleblower under Sarbanes Oxley and Dodd Frank.  (*See e.g. id.* Ex. A.)  In his complaint, Erhart states, "BOFI stock recently reached an all-time high of $143.92 per share.  On information and belief, BOFI's valuation is based, at least in part, upon inaccurate information being supplied by the Bank to the public and regulators." (*Id.* Ex. A ¶ 5.)  In addition to being false, such an assertion in a wrongful termination case is clearly aimed at the investor community to drive down BofI's share price.  Indeed, as explained below, these are the same baseless accusations that Aurelius has levied against BofI in his series of curiously timed, and increasingly sensational blog postings.  (*See* Towill Decl. ¶ 21-31, Exs. 12-22.)

On October 19, 2015, BofI filed the Underlying Action against Erhart for, among other things, breach of contract, conversion, and fraud.  (*Id.* ¶ 4.)  BofI moved swiftly to stop Erhart's unlawful distribution of BofI's confidential information.  On November 2, 2015, BofI obtained a temporary restraining order

---

[6]    Eavis then posted an article containing BofI's confidential information online. It was also published the next day in print.  (*See* Towill Decl. ¶ 15, Ex. 8.)

("TRO") against Erhart and his "agents" (including Gillam) requiring them to "refrain from disclosing, reviewing, sharing, transmitting, and/or using, any confidential, privileged, or proprietary information belonging to BofI, its employees, its business counterparties, its customers, and/or its clients." (*Id.* ¶ 7, Ex. 2.)  On November 16, 2015, the Court entered an order supplementing the TRO to impose additional obligations on Erhart and Gillam requiring them to identify all individuals and/or entities to whom they transmitted BofI's confidential information.  (*Id.* ¶ 8, Ex. 3.)  Despite the TRO, however, Gillam concealed the fact that she had widely disseminated BofI's confidential information to financial players in the short seller community, including, potentially, Aurelius.

The OCC, BofI's principal regulator, has already recognized that Erhart's complaint (the same complaint that, as explained below, Gillam distributed to short sellers before the market opened) improperly disclosed BofI's confidential information.  On October 30, 2015, the OCC sent BofI a letter stating that it had reviewed Erhart's purported "whistleblower" action and determined that it disclosed "privileged non-public OCC information."  (*See id.* ¶ 6, Ex. 1.)  The OCC's letter evidences two things:  Gillam and Erhart *accessed* and then improperly *distributed* BofI's confidential information.

**B.  BofI Uncovers Evidence That Gillam Has Disseminated BofI's Confidential Information To Short Sellers**

Gillam's apparent pre-filing communications with Eavis and cavalier disregard for the confidentiality of BofI's OCC communications prompted BofI to subpoena Gillam to determine the extent of and to whom she distributed BofI's confidential information.  (Towill Decl. ¶ 9, Ex. 4.)  Gillam resisted BofI's subpoena; but BofI filed, and *won*, a motion to compel.  (*Id.* ¶ 10, Ex. 5.)

On May 10, 2016, Gillam produced her communications with third parties

regarding BofI. (*Id.* ¶ 11.) Gillam's production confirmed BofI's fears.[7] As early as May 2015, Gillam began communicating with and providing information to Eavis of *The New York Times*. (*Id.* ¶ 11; Ex. 6.) Over the course of the next three months, Gillam and Eavis communicated several times leading up to the publication of Eavis' first article about BofI on August 22, 2015. (Ex. 6 at TGLF000007-11; *Id.* ¶ 14, Ex. 7.) Interestingly, Eavis' article, published nearly two months prior the filing Erhart's complaint, previewed some of the accusations in his complaint. (*See id.*) Gillam's numerous conversations with Eavis during the "pre-filing" period likely provided Eavis with fodder for his negative articles on BofI.[8]

On October 13, 2015, Gillam provided Eavis a pre-filing copy of Erhart's complaint and advised him not to alert BofI. (Ex. 6 at TGLF000012-13.) Eavis used his advance notice of Erhart's complaint to publish a scathing article about BofI after the markets had closed that day. (*Id.* ¶ 15, Ex. 8.)

While Eavis was publishing his hit-piece in *The New York Times*, Gillam began disseminating copies of Erhart's complaint to known short-sellers, such as: (i) Ascend Capital, LLC, a short selling hedge fund; (ii) Grizzly Rock Capital, a short selling hedge fund; and (iii) Eric DeLamarter (the founder of Half Moon Capital, LLC, another short selling hedge fund). (Ex. 6 at TGLF000025, 35-37, 46.) The very next day, BofI's stock dropped 30%—representing over half-a-billion dollars of lost market capitalization. (*Id.* ¶ 16, Ex. 9.) In her correspondence, Gillam was gleeful about the fact that she had destroyed hundreds of millions of

---

[7] BofI has reason to believe that Gillam's production was not complete and that some correspondence may have been omitted. Additionally, Gillam has not yet provided a privilege log. As such, there may be additional responsive communications that BofI has not yet received but intends to pursue. (Towill Decl., ¶ 12.)

[8] For example, Gillam discusses with Eavis a non-public SEC subpoena of a BofI customer. (*See* Towill Decl. ¶ 11, Ex. 6 at TGLF000011.)

1    dollars in BofI's market capitalization.[9]

2    **C.    Short Seller "Aurelius" Appears To Be In On The Scheme To "Short**

3          **And Distort" BofI's Stock.**

4          *Seeking Alpha* is a crowd sourced financial blog, which publishes blog

5    articles on a broad range of stocks, asset classes, and investment strategies

6    (including short selling).  Given Gillam's prior unauthorized disclosures to *The New*

7    *York Times*, BofI began to monitor other media outlets to determine whether Gillam

8    and/or her client were continuing to leak BofI's confidential information.  (Towill

9    Decl. ¶ 17.)  As an anonymous, crowd sourced website, *Seeking Alpha* is a natural

10   platform for a rogue former employee, such as Erhart, acting individually or in

11   concert with others, to continue to anonymously leak BofI's confidential

12   information.  *Seeking Alpha* is also a natural platform for "short and distort"

13   schemes whereby short sellers fabricate "hit pieces" intended to negatively affect

14   the value of publicly traded securities based on speculation and innuendo.

15          After Gillam's October 13, 2015 leak to *The New York Times*, BofI noticed a

16   considerable uptick in BofI coverage on *Seeking Alpha's* website.  In particular, the

17   pseudonymous author "Aurelius" has engaged in an unrelenting campaign to tarnish

18   BofI.  Although Aurelius had published 11 blogs on *Seeking Alpha* prior to October

19   13, 2015 (the date Erhart initiated his action), **none** of those blogs concerned BofI.

20   (*Id.* ¶ 20, Ex. 11.)  However, since Erhart initiated his lawsuit, Aurelius has devoted

21   11 blogs to trashing BofI.  (*See id.*)

---

22   [9]    Gillam repeatedly celebrated the destructive effect of her plan.  In numerous
23         emails, she rejoiced that "the company's stock lost ¼ of its value today on the
        news" of "a case I filed yesterday after the market closed."  (Ex. 6,
24         TGLF000034.)  To yet another person, Gillam boasted: "by the way a high-
        flying stock dropped 30% at the open this morning on a lawsuit I filed after
25         the market closed yesterday."  (*Id.*, TGLF000039.)  And to a third person,
26         Gillam stated "this is the case I was on deadline for yesterday—huge market
        reaction…. Stocked [sic] dropped 30% on the open this morning."  (*Id.*,
27         TGLF000041.)

1    Although Aurelius claims that his blog postings are supposedly based on
2    "publicly available" information, the timing of Aurelius' blog postings coincides
3    with the beginning of Gillam's and Erhart's apparent "short attack" on BofI.  For
4    example, in a November 10, 2015 blog posting, Aurelius references stale
5    information concerning BofI's lending relationship with, and assignments to, third
6    parties to speculate regarding BofI's loan origination practices.  (*See id.* ¶ 23, Ex.
7    14.)  The supposedly public documents referenced in the blog date back to July 3,
8    2014 (Bulk Assignment of Loans) and January 13, 2015 (Business Loan Agreement
9    between BofI and Quick Bridge Funding).  (*See id.*)  Despite the fact that Aurelius
10   had access to these allegedly "public documents" for months prior to Gillam's
11   communications with short sellers, Aurelius waited to publish his blog postings so
12   that they would coincide with Gillam's efforts.

13       Many of Aurelius' other BofI-related blog postings are similarly based on
14   stale "public" documents.  (*See e.g.* Towill Decl. ¶ 24, Ex. 15 (referencing an April
15   17, 2014 UCC financing statement between BofI and Center Street Lending); *id.* ¶
16   23, Ex. 14 (referencing a February 14, 2014 UCC financing statement between BofI
17   and Blackrock Lending Group); *id.* ¶ 27, Ex. 18 (referencing a May 2, 2014 UCC
18   financing statement between BofI and Propel Financial and loan transactions going
19   as far back as 2012).)  Aurelius did not publish his hit pieces when the supposedly
20   "public" information regarding BofI was fresh.  Instead, Aurelius waited until after
21   Gillam had given the short sellers the green light—until after the "short attack" had
22   begun.

23       Even if Aurelius' blog postings contain entirely public information, BofI has
24   a good faith belief that somebody with access to BofI's confidential information,
25   such as a former employee, may be directing Aurelius' "research."  Aurelius' blog
26   postings reference a variety of allegedly "public" documents in a wide range of
27   jurisdictions.  (*See id.* Ex. 17 (Delaware certificate of incorporation, Delaware UCC
28   financing statement, and San Diego county recorder records); Ex. 20 (discussing

1  BofI's Nevada branch); Ex. 19 (discussing Oklahoma real property and "local"
2  Oklahoma business journal).)  BofI has a right under the rules of discovery to ask
3  Aurelius what prompted him to dig up routine business documents in jurisdictions
4  across the United States.  The inference that Aurelius may be coordinating with
5  Erhart or Gillam is further supported by the fact that he refers to his own blogs to
6  argue that Erhart's claims against BofI have been "substantiated."  (*See id.* Ex. 16
7  ("some of Mr. Erhart's allegations have already been independently substantiated
8  and a series of recent articles have confirmed that BofI has plenty to hide.").)

9       In addition to the suspect timing of Aurelius' blog blitz against BofI, the
10  misleading, innuendo-laden nature of his activities on *Seeking Alpha* further
11  reinforces BofI's belief that Aurelius is colluding with Erhart or Gillam (or short
12  sellers) and has therefore accessed BofI's confidential information.  For example,
13  despite BofI's industry leading low loan write-offs, Aurelius accuses BofI of
14  transferring "bad loans" to off balance sheet entities.  (*Id.* Ex.15.)  In another blog,
15  Aurelius claims that certain *publicly disclosed* BofI related party transactions are so
16  dire that they threaten the company's listing status on the NASDAQ exchange.  (*Id.*
17  Ex. 18.)  In still another, Aurelius claims that supposed business troubles at a
18  financial institution that constitutes a small part BofI's business will "engulf" BofI.
19  (*Id.* Ex. 21.)  Naturally, none of Aurelius' dire predictions regarding BofI have
20  actually come to pass.  Rather, they appear to be part of Erhart's or Gillam's all but
21  confessed scheme to damage BofI's market capitalization.

22       Despite the blog postings' misleading nature, commenters on Aurelius' blog
23  postings have confirmed the effect Aurelius'' blogs have on investors.  For example,
24  one commentator noted "I am out now but was long." (*Id.*, Ex. 16.)  Another
25  commentator described accurately the impact of Aurelius' blogs on BofI's stock
26  price: "A series of short-attack articles, from an unknown writer using a blog-handle
27  of Aurelius, drove the stock price lower."  (*Id.* Exh. 18.)  Separately, the
28  sensational nature of Aurelius' blog postings is further evidenced by the irrelevant

associations he has included in his postings, including pictures of notorious financial fraudsters, such as Anthony Mozilo (of Countrywide).  (*Id.* Ex. 21.)  Mozilo has nothing to do with BofI.

**D.      BofI's Current And Former Attempts To Discover Aurelius' Identity.**

In light of the blogs and their apparent reference to Erhart's allegations, BofI subpoenaed *Seeking Alpha* to determine the identity of Aurelius in order to subpoena him to discover his connection to Erhart and his attorney.  (Towill Decl. ¶ 32.)  As a result of *Seeking Alpha's* resistance to BofI's subpoena, BofI filed a motion to compel in the U.S. District Court for the Southern District of New York.  (*Id.* ¶33.)  Although BofI suspected at the time that it was the target of a "short and distort" scheme stemming from Erhart's theft, it had not yet obtained access to Gillam's numerous improper communications with short sellers.

On February 9, 2016, the Hon. J. Paul Oetken held the hearing on BofI's motion to compel and *Seeking Alpha's* concurrent motion to quash.  (*See id.* ¶ 34.)  Although Judge Oetken recognized that BofI's subpoena was narrowly tailored and that arguments could be made both ways regarding Aurelius' expectation of privacy, on the record before the Court "there was no plausible basis for concluding there [was a] short conspiracy" sufficient to overcome the protections of the First Amendment.  (*See id.* Ex. 25.)  Accordingly, Judge Oetken denied BofI's motion to compel and granted *Seeking Alpha's* concurrent motion to quash the subpoena.  (*Id.*)

Judge Oetken's order implicitly recognized that BofI needed to uncover additional evidence to overcome Aurelius' First Amendment protections.  As result, BofI continued its investigation into Aurelius' identity and the short seller conspiracy.  It was not until Gillam produced documents pursuant to the court order on May 10, 2016 that BofI learned that Erhart and his agent Gillam had actively disseminated BofI's confidential information to known short sellers.

Meanwhile, around January of 2016, BofI learned that Aurelius was distributing materials related to BofI's action against Erhart on www.dropbox.com

("Dropbox").  (*Id.* ¶ 35.)  As a result, BofI subpoenaed Dropbox to obtain Aurelius'
user information.  (*Id.*)  In response to the subpoena, Dropbox produced Aurelius'
registered name (Aurelius Value), email address (aurelius.seekingalpha
@gmail.com), and IP address.  (*Id.*)  Although the first two pieces of information
were a dead end, BofI traced Aurelius' IP address to CenturyLink.  (*Id.*)

On May 11, 2016, BofI issued a subpoena to obtain the subscriber
information for the person or entity utilizing Aurelius' IP address.  (*Id.* Ex. 36.)  On
May 17, 2016, CenturyLink responded to the subpoena indicating that it was
prepared to produce responsive records, but that BofI must first pay a $50
administrative fee.  (*See id.* ¶ 37, Ex. 27.)  CenturyLink's response is consistent with
Aurelius' low expectation of privacy regarding his identifying information on his
CenturyLink account.  CenturyLink's privacy policy states that it may disclose,
among other things, its customers' "name, address, [and] telephone number" in
response to civil subpoenas.  (*See id.* ¶ 38, Ex. 28.)  It also states that, "[l]ike other
businesses, we may share information… to comply with laws or to respond to lawful
demands such as subpoenas or court orders."  (*Id.*)

On May 24, 2016, an attorney located in San Francisco called BofI's attorney
to explain that she represented Aurelius and was planning to file a motion to quash
the Subpoena.  (*Id.* ¶ 39.)  On May 25, 2016, BofI learned that Aurelius had
obtained new counsel located in Los Angeles.  (*Id.* ¶ 40.)  On May 26, 2016,
Aurelius' counsel called counsel for BofI and stated her intent to file a motion to
quash the Subpoena and asked if BofI would accept Aurelius providing information
to BofI anonymously.  (*Id.* ¶ 41.) Despite suggesting that she would call BofI's
counsel back, Aurelius' counsel never contacted BofI's counsel again.  Despite
being located in Los Angeles, Aurelius' counsel failed to meet and confer with
BofI's counsel in person prior to filing Aurelius' motion to quash the Subpoena.
(*Id.*)

# III.

## LEGAL STANDARDS APPLICABLE TO A MOTION TO QUASH

Rule 45 of the Federal Rules of Civil Procedure provides the framework for securing from non-parties, through the use of subpoenas, documents relevant to pending litigation.  Fed. R. Civ. P. 45 (a), (b).  It is well settled that the scope of a Rule 45 subpoena is informed by Rule 26, which governs civil discovery generally. *See Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994).

"Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit..." Fed. R. Civ. P. 26(b)(1).  Once the party seeking discovery establishes that the request meets this relevancy requirement, "the party who resists discovery has the burden to show that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." *Directv, Inc. v. Trone,* 209 F.R.D. 455, 458 (C.D. Cal. 2002); *Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) (requiring party opposing discovery to "carry a heavy burden of showing why discovery was denied.").  With respect to objections based on the First Amendment, the party opposing discovery has the initial burden of making a *prima facie* showing of arguable First Amendment infringement.  *See In re: Anonymous Online Speakers*, 661 F.3d 1168, 1174 (9th Cir. 2011).  The burden then shifts to the party seeking discovery to "demonstrate a sufficient need for the discovery to counterbalance that infringement."  *Id.* (recognizing the balancing test set forth in *Perry v. Schwarzenegger,* 591 F.3d 1147, 1164 (9th Cir. 2010)).

**IV.**

## AURELIUS HAS FAILED TO COMPLY WITH THE MANDATORY RULES SET FORTH IN LOCAL RULES 37-1 AND 45-1

The Central District's Local Rule 45-1 requires that *all* motions relating to discovery subpoenas served on non-parties represented by counsel comply with Local Rule 37, which sets forth the procedural requirements for discovery motions. As relevant here, Local Rule 37-1 requires counsel for the moving party (here, Aurelius) to arrange for an *in person* meet and confer prior to filing the motion, if counsel for both parties are located in the same district. Likewise, Local Rule 37-2.2 requires the moving party to prepare a Joint Stipulation for the parties to set forth their respective positions on the discovery dispute. Lastly, Local Rule 37-2.4 states:

> The Court *will not* consider any discovery motion in the absence of a joint stipulation or a declaration from counsel for the moving party establishing that opposing counsel (a) failed to confer in a timely manner in accordance with L.R. 37-1; (b) failed to provide the opposing party's portion of the joint stipulation in a timely manner in accordance with L.R. 37-2.2; or (c) refused to sign and return the joint stipulation after the opposing party's portion was added. (emphasis added)

As explained below, Aurelius has failed to comply with Local Rules 45-1 and 37. First, despite the fact that Aurelius' counsel is located in Los Angeles, Aurelius' counsel failed to meet and confer in person with BofI's Los Angeles based counsel prior to filing the motion to quash. (Towill Decl. ¶ 43.) Second, Aurelius did not submit his motion to quash as a Joint Stipulation or submit a declaration of counsel explaining his failure to conform to the Local Rules. Aurelius' non-compliance with the Court's Local Rules is fatal to his motion to quash the Subpoena. Local Rule 37-2.4 is unmistakable: the Court *will not* consider any discovery motion in the

-15-

absence of a Joint Stipulation or a declaration from counsel explaining his or her failure to comply with the Local Rules.  Accordingly, the Court need not consider Aurelius' substantive objections to the Subpoena.  Rather, the Court should deny Aurelius' motion to quash on the basis of its procedural improprieties alone.

## V.

## THE COURT SHOULD DENY AURELIUS' MOTION TO QUASH THE SUBPOENA

Even if Aurelius' motion to quash the Subpoena were procedurally correct (and it is *not*), the Court should still deny the motion.  As explained below, the Subpoena seeks highly relevant and probative information; Aurelius' misleading commercial speech is not protected by the First Amendment; and, regardless, BofI has made a sufficient showing to entitle it to discover Aurelius' real identity.

### A.    Aurelius' Identifying Information Is Highly Relevant To BofI's Claims.

Relevant information is non-privileged information that is "relevant to any party's claim or defense" so long as it is "proportional to the needs of the case" in light of the factors set forth in Rule 26(b)(1).  Here, BofI's Subpoena seeks relevant information.

BofI filed its action after it learned that Erhart and/or his attorney had wrongfully disseminated BofI's confidential information.  Gillam's May 10, 2016 production confirmed BofI's fears that she had coordinated with the press and communicated with short sellers, then rejoiced at her apparent manipulation of BofI's stock price.  Whether and to what extent Erhart and Gillam have disclosed BofI's confidential information to third-parties (such as and potentially including Aurelius) is relevant to proving BofI's substantive claims against Erhart for breach of his confidentiality obligations.  Likewise, any communications between Gillam (or the short sellers on her distribution list) and Aurelius regarding BofI are relevant because they may reveal (i) the nature of the information concerning BofI which has been provided to short sellers; (ii) the identity of the persons disseminating BofI's

1  confidential information; and (iii) the identity of the people participating in the

2  "short attack" on BofI's stock.  In addition, the information is relevant to whether

3  Erhart and Gillam have continued to disclose such information in direct violation of

4  the TRO.

5      Whether Gillam and Erhart have conspired with Aurelius is also relevant to

6  BofI's claim that Erhart engaged in unauthorized "rogue audits" of BofI's business

7  outside of the scope of his employment.  (RJN Ex. B, ¶¶ 23-29.)  Erhart may have

8  been motivated to engage in the rogue audits to drum up material for Aurelius'

9  "short and distort" blog postings.  Moreover, BofI must question Aurelius to

10  determine the extent of the overlap between the subjects of Erhart's unauthorized

11  audits and the subject matter for Aurelius' blog postings.

12      Finally, to support its claim of damages against Erhart, BofI must depose

13  Aurelius to determine whether and to what extent he has relied upon BofI's

14  confidential information (including information that Erhart and Gillam have

15  unlawfully made publicly available) to compose his blogs.  Determining whether

16  and to what extent Erhart and Gillam have disseminated BofI's confidential

17  information goes to the heart of BofI's claims in this action.  Conversely, Aurelius

18  has submitted no evidence to show that the burden of disclosing his identity

19  outweighs BofI's interest in investigating its claims.  In sum, BofI easily satisfies

20  the test for relevance.

21  **B.    The First Amendment Does Not Weigh In Favor Of Preserving Aurelius'**

22  **Anonymity.**

23      As shown above, Aurelius does not (and cannot) argue that his identity is

24  irrelevant to BofI's claims in the Underlying Action.  Rather, Aurelius' only

25  objection to the Subpoena is that it purportedly infringes on his First Amendment

26  right to speak anonymously.  (Mot. at 6.)  As explained below, the Court should

27  deny Aurelius' motion to quash the Subpoena because Aurelius' blog postings are

28  misleading commercial speech and are not entitled to First Amendment protections.

-17-

1  In the alternative (and without conceding that this test applies), BofI has satisfied the

2  factors set forth in *Doe v. 2TheMart.com Inc.,* 140 F. Supp. 2d 1088, 1095 (W.D.

3  Wash. 2001) (*2TheMart*), necessary to reveal the identity of anonymous internet

4  speakers.

5         1.   <u>Aurelius' Blog Postings Are Misleading Commercial Speech And Are</u>

6            <u>Not Entitled To First Amendment Protections.</u>

7        In the moving papers, Aurelius overreaches by suggesting that the Ninth

8  Circuit has adopted the standard set forth in *2TheMart* for discovering the identity of

9  anonymous speakers. (Mot. at 8.) Not so. Although the Ninth Circuit has

10 recognized and discussed a wide variety of standards, it has *not* adopted a uniform

11 standard for analyzing First Amendment objections to the disclosure of the identity

12 of anonymous internet speakers. *See In re: Anonymous Online Speakers*, 661 F.3d

13 at 1175-1177 (discussing various standards).[10] Instead, the law in the Ninth Circuit

14 is that "the nature of the speech should be the driving force in choosing a standard

15 by which to balance the rights of anonymous speakers in discovery disputes." *Id.* at

16 1177. Some types of speech, such as political speech, are afforded "the highest

17 levels of protection." *Id.* at 1173. Commercial speech, however, enjoys a "limited

18 measure of protection… as long as the communication is neither misleading nor

19 related to unlawful activity." *Id.* (citations omitted). Here, Aurelius' blog postings

20 are for-profit communications, intended to negatively affect the price of BofI's stock

21 in favor of his admitted "short" position. (*See e.g.* Towill Decl. Exs. 14-18.)

22

---

23 [10]    Aurelius' citation to *Mount Hope Church v. Bash Back!,* 705 F.3d 418, 423

24      (9th Cir. 2012) to imply that the Ninth Circuit has adopted the *2TheMart*

25      standard is misleading. In *Mount Hope*, the Ninth Circuit reversed the lower

      court's ruling awarding sanctions in favor of the targets of a Rule 45

26      subpoena. *Id.* at 423, 429-430. Although the Ninth Circuit notes that the

27      lower court considered two separate standards (including the *2TheMart*

      standard) when granting the motion to quash, this discussion is dicta provided

28      by way of background. *See id.* at n. 4.

Commercial speech is an "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Commc'n*, 447 U.S. 557, 561 (1980). The Fourth Circuit's decision in *Lefkoe* shows why Aurelius' blog postings constitute commercial speech. *See* 577 F.3d 240. In *Lefkoe*, a stock holder ("Doe") of Jos. A. Bank, through his attorneys, sent an anonymous letter to the Audit Committee of Jos. A. Bank complaining of supposed problems with Jos. A. Bank's public communications and financial reporting. *Id.* at 242. In response, the Audit Committee investigated the claims, but was forced to delay Jos. A. Bank's scheduled earnings report pending the investigation. *Id.* at 243. After spending approximately $600,000 investigating Doe's claims, the Audit Committee concluded that the anonymous speaker's allegations were "without substance." *Id.* Nevertheless, the delay in Jos. A. Bank's financial reporting negatively affected its stock price. *Id.* Jos. A. Bank was subsequently sued for securities fraud. *Id.* at 242.

Jos. A. Bank uncovered evidence that Doe: (i) took deliberate action to drive down the market price for Jos. A. Bank's stock; and (ii) was a known short seller of Jos. A. Bank's stock. *Id.* at 244. On this basis, Jos. A. Bank subpoenaed Doe's counsel to determine his identity. *Id.* at 243. Doe objected on First Amendment grounds and filed a motion to quash the subpoena. *Id.* Allowing for the possibility that Doe might be complicit with the securities plaintiffs and that his letter was "part of a cabal… to affect Jos. A. Bank's stock price and then sue," the trial court denied the motion to quash. *Id.* On appeal, the Fourth Circuit affirmed the trial court's denial of the motion to quash the subpoena. *Id.* at 242.

As relevant here, the Fourth Circuit first concluded that Doe's anonymous stock holder letter to the Audit Committee was commercial speech because it "related solely to the economic interest of the speaker and its audience"—in other words, his financial interests as a Jos. A. Bank investor. *See id.* at 248. The trial court's order overruling Doe's First Amendment objection was justified because

1    Doe's information was "relate[d] to the litigation and [was] necessary [for Jos. A.

2    Bank] to defend itself."  *Id.* at 249.  Indeed, the fact that Doe was a "known short

3    seller and that short selling during the class period, as opposed to Jos. A. Bank fraud

4    or malfeasance, may have been a cause of the drop in the price of Jos. A. Bank

5    stock" weighed in favor of disclosure.  *Id.*  Thus, the Fourth Circuit affirmed the

6    lower court, recognizing that "the substantial governmental interest in providing Jos.

7    A. Bank a fair opportunity to defend itself in court [was] served by requiring Doe[]

8    to reveal its identity and provide the relevant information."[11]  *Id.*

9         The same result follows here.  Aurelius' blog postings are categorically

10   commercial speech.  He is a short seller of BofI's stock.  (*See e.g.* Towill Decl. ¶¶

11   23-27, Exs. 14-18.)  Aurelius' financial interests (and those of the other short

12   sellers) are served by driving down BofI's stock price.  Indeed, the very nature of

13   stock and commentary regarding stock shows its commercial quality.  The stock of a

14   public corporation is an investment convertible to cash and traded among members

15   of the public.  Aurelius' blog postings are not guided by political, religious, or

16   literary aspirations— rather, they are commentary on the *value* of BofI's stock and

17   relate to the economic interests of Aurelius and the other short sellers.

18        In addition, the First Amendment does not protect the anonymity of Aurelius'

19   speech because his blog postings are misleading and possibly unlawful.  The United

20   States Supreme Court has held that the First Amendment does not protect

21   commercial speech that is false, deceptive, or misleading.  *See Virginia Pharmacy*

22   *Bd. v. Virginia Consumer Council*, 425 U.S. 748 (1976) ("[u]ntruthful speech,

23   commercial or otherwise, has never been protected for its own sake"); *Central*

24

25   [11]   The *Lefkoe* decision is instructive because it discusses a mechanism by which
26         the Court can facilitate BofI's legitimate need for discovery while protecting
         Aurelius' anonymity.  In *Lefkoe*, the trial court permitted the deposition of the
27         anonymous speaker, subject to a protective order requiring the parties to keep
         his identity confidential.  577 F.3d at 243.
28

-20-

1   *Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.,* 447 U.S. 557, 563-564

2   (1980)(the First Amendment, while offering protection to truthful commercial

3   speech, does not protect false or misleading commercial speech).  *See also Alvis*

4   *Coatings, Inc. v. John Does One Through Ten*, 2004 U.S. Dist. LEXIS 30099 at *8

5   (W.D.N.C. 2004) (denying motion to quash subpoena and noting that, just as the

6   right to speak anonymously is generally protected under the First Amendment, it is

7   "equally well settled that the First Amendment does not protect false commercial

8   speech").  Indeed, courts frequently uphold state regulation of unlawful or

9   misleading commercial speech for the reasons set forth above.  *See, e.g.*, *Fanning v.*

10  *FTC*, 2016 U.S. App. LEXIS 8519 (1st Cir. 2016) (upholding order enjoining

11  website owner from making misrepresentations on his website about the source of

12  content on the website and membership benefits), *Friedman v. Rogers*, 440 U.S. 1

13  (1979) (regulation on commercial speech that is false, deceptive, and misleading is

14  permissible).

15          Aurelius' predictions that BofI will soon be "engulfed" by the "implosion" of

16  small business loans is misleading because the fees BofI earns through this

17  relationship are immaterial and pose no threat to its financial well-being.  (*Id.* Ex.

18  21.)  Likewise, Aurelius' wild claim that BofI risks being delisted from the

19  NASDAQ due to its *disclosed* employee loan program is misleading as there is no

20  indication that BofI may be delisted from the NASDAQ.  (*Id.* Ex. 18.)  Finally, if

21  Aurelius has conspired with Gillam (or short sellers) to "short and distort" the

22  market for BofI's stock, then his conduct constitutes illegal market manipulation and

23  is not protected by the First Amendment.

24          To the extent Aurelius is entitled to any First Amendment protections (and he

25  is not), his limited First Amendment interests must yield to BofI's interest in

26  prosecuting the Underlying Action against Erhart and investigating the apparent

27  short seller conspiracy.  Indeed, denying BofI the ability to obtain such highly

28  relevant discovery from Aurelius would be prejudicial to BofI's ability to pursue its

-21-

1  action.  Accordingly, the Court should deny Aurelius' motion to quash the

2  Subpoena.

3    2.    Even If The Court Concludes That Aurelius' Blog Postings Are Not

4          Misleading Commercial Speech, BofI Has Satisfied The *2TheMart*

5          Factors For Discovering Aurelius' Identity.

6    The *2TheMart* test considers the following four factors:  (i) whether the

7  subpoena seeking the information was issued in good faith and not for any improper

8  purpose, (ii) whether the information sought relates to a core claim or defense, (iii)

9  whether the identifying information is directly and materially relevant to that claim

10  or defense, and (iv) whether information sufficient to establish or to disprove that

11  claim or defense is unavailable from any other source.  *See* 140 F. Supp. 2d at 1095.

12  As show below, even if Aurelius' blog postings are not unprotected misleading

13  commercial speech (and they are), BofI has satisfied the *2TheMart* factors.[12]

14    a.    BofI Issued Its Subpoena In Good Faith.

15    Aurelius argues that BofI did not issue the Subpoena in good faith because

16  BofI previously lost on its motion to compel against *Seeking Alpha* and did not

---

[12] By addressing the *2TheMart* factors briefed by Aurelius, BofI does not
concede that the *2TheMart* test applies.  To the contrary, given the
commercial nature of Aurelius' speech (and assuming the speech is not, as it
is, misleading or unlawful), BofI would be subject to the lower standard
articulated in *Highfields Capital Mgmt., L.P. v. Doe*, 385 F. Supp. 2d 969
(N.D. Cal. 2005), requiring the plaintiff to make a *prima facie* showing of the
claim for which the plaintiff seeks the disclosure of the anonymous speaker's
identity.  Indeed, the *Highfields Capital* standard may well apply here because
Aurelius may already be (or may become) a defendant.  *See In re: Anonymous
Online Speakers*, 661 F.3d at 1775.  If the Court is disinclined to deny the
motion on the grounds set forth at *infra* V.B.1. and believes that BofI has not
satisfied the *2TheMart* standard, then the Court should deny the motion
because BofI has satisfied the lower *prima facie* showing standard by
demonstrating the Subpoena seeks information related to a core claim.  *See
infra* V.B.2.b.

specify any details in Aurelius' *Seeking Alpha* blog postings that were not obtained from the public record.  (Mot. at 9-10.)  These contentions are invalid.  As explained in *2TheMart*, a subpoena is issued in good faith where the subpoenaing party "could reasonably believe that the [identity of the anonymous speaker] is relevant [to its claims or] defense[s]."  140 F. Supp. 2d at 1095.  As set forth at *supra* V.A., BofI has more than satisfied its burden of showing that Aurelius' identity is relevant to the claims against Erhart and its claims for market manipulation.

Moreover, in light of BofI's newly discovered evidence of market manipulation and a short seller conspiracy involving Erhart's counsel, BofI has done what the court suggested was necessary after its previous loss against *Seeking Alpha*.  BofI did not have then what it has now—proof of a plausible market manipulation scheme spearheaded by Erhart, Gillam, and a cabal of short sellers.  In addition, Aurelius' continued publication of increasingly misleading and erroneous blog postings solidifies the conclusion that his blog postings are intended to distort the price of BofI's stock.  Accordingly, this factor weighs in favor of denying Aurelius' motion to quash.

              b.      The Subpoena Relates To A Core Claim.

Aurelius contends that BofI fails to satisfy this factor because the blogs do not reveal any non-public information.  (Mot. at 10.)  However, Aurelius ignores BofI's: (i) strong evidence of a short seller conspiracy; and (ii) need to depose Aurelius to trace its damages in the underlying action to the improper, now verified, leaks of its confidential information.  In addition, that Aurelius may have not, as of yet, publicly disclosed BofI's confidential information does not mean that he has not *received* such information from Gillam or Erhart.  In sum, this factor also weighs in favor of denying the motion to quash.

              c.      The Subpoena Seeks Information That Is Directly And
                    Materially Relevant To BofI's Core Claims.

-23-         Case No. 2:16-mc-71
SMRH:477893904.3    BOFI'S OPPOSITION TO AURELIUS' MOTION TO QUASH THE SUBPOENA ISSUED TO
CENTURYLINK

1    Resting on his conclusory assertion that the Subpoena does not relate to a core

2    claim or defense, Aurelius does not offer any additional argument regarding this

3    factor.  (*See id*.)  Again, however, BofI has incontrovertible evidence that:  (i)

4    Gillam improperly disclosed BofI's confidential information; (ii) was part of a

5    conspiracy to distribute this information to short sellers; and (iii) short seller

6    Aurelius began his blog posting campaign in tandem with Gillam's leaks.  (Towill

7    Decl. ¶ 20, Ex. 11.)

8    The Court's analysis of this factor in *2TheMart* is instructive.  In that case,

9    2TheMart speculated that the users of an online message board may have been

10   engaged in stock market manipulation in violation of federal securities laws.  140 F.

11   Supp. 2d at 1097.  The Court found that this factor weighed against disclosure

12   because the First Amendment rights of internet users "cannot be nullified by an

13   *unsupported allegation* of wrongdoing raised by the party seeking the information."

14   *Id.* (emphasis added).  Here, of course, BofI has evidence that has corroborated and

15   continues to corroborate its suspicions, and is entitled to conduct discovery into the

16   short seller scheme to manipulate the market for its stock.

17            d.    Information Concerning Aurelius' Identity Is Not Available

18                  From Any Other Source.

19   On this final factor, Aurelius contends that BofI can determine his identity by

20   messaging him through *Seeking Alpha's* website or by deposing Erhart.  (Mot. at 10-

21   11.)  If Aurelius were willing to voluntarily disclose his identity, then presumably he

22   would have done so through counsel instead of incurring the expense of filing his

23   motion to quash the Subpoena.  Indeed, BofI previously provided Aurelius with

24   notice of its subpoena to *Seeking Alpha* on the message board for one of his blog

25   postings—needless to say, Aurelius did not come forward and identify himself.  In

26   sum, this factor weighs heavily against granting the motion to quash.

27

28

# VI.

## CONCLUSION

As explained above, Aurelius' motion to quash the Subpoena is procedurally improper and substantively deficient.  Accordingly, the Court should deny the motion to quash the Subpoena and permit BofI to discover from CenturyLink the identifying information for anonymous short seller Aurelius.

Dated:  June 14, 2016

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____
                    /s Polly Towill
                    POLLY TOWILL
                    ANDRE J. CRONTHALL

                    Attorneys for Respondent
                    BofI FEDERAL BANK