SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
POLLY TOWILL, Cal. Bar No. 120420
  ptowill@sheppardmullin.com
ANDRE J. CRONTHALL, Cal. Bar No. 117088
  acronthall@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California  90071-1422
Telephone: 213.620.1780
Facsimile: 213.620.1398

Attorneys for Respondent
BofI FEDERAL BANK

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| AURELIUS, an individual,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>BofI FEDERAL BANK,<br>a federal savings bank,<br><br>　　　　Respondent. | Case No. 2:16-mc-71<br><br>**BOFI FEDERAL BANK'S SUPPLEMENTAL BRIEF IN OPPOSITION TO AURELIUS' MOTION TO QUASH THE SUBPOENA ISSUED TO CENTURYLINK COMMUNICATIONS, LLC**<br><br>Assigned to the Hon. Frederick F. Mumm |

SMRH:478589530.2

Case No. 2:16-mc-71
BOFI'S SUPPLEMENTAL BRIEF IN OPPOSITION TO AURELIUS'
MOTION TO QUASH THE SUBPOENA ISSUED TO CENTURYLINK

## I. THERE IS A STRONG NEXUS BETWEEN THE INFORMATION ERHART STOLE FROM BOFI AND AURELIUS' ARTICLES

### A. Selected Examples in Aurelius' Blogs of Information Likely Originating from Documents Stolen by Erhart

The Court has requested that BofI provide examples demonstrating the nexus between the information revealed in Aurelius' blogs and the information undisputedly stolen by BofI's former employee, Erhart, while he had access to confidential information as a junior auditor. Pursuant to a restraining order in the underlying action, Erhart produced his personal devices, including his personal computer, a USB device, and his personal email to BofI for inspection by a forensic computer analyst. As illustrated below, the evidence shows that Erhart has been engaging in illegal public dissemination of BofI's confidential information since before he even left BofI and that he has used third parties, including but not limited to Aurelius, to further his scheme. Aurelius' blogs contain direct references to BofI confidential information that was found in Erhart's personal possession and that Aurelius would only have included if an insider pointed him in that direction.

#### 1. Erhart's Dissemination of Information to Third Parties While Working at BofI

Even while Erhart was still at BofI, it appears that he was coordinating with third parties to unlawfully disseminate confidential information as part a short-sell attack against BofI. In January and February 2015, Erhart admits he began contacting the SEC, trying to prompt an investigation. Not coincidentally, immediately thereafter, the SEC began to receive repeated FOIA requests from an individual concerning BofI and whether or not the SEC was investigating BofI, presumably to later report the existence of any investigation to the media to help drive BofI's stock down. The only way that this individual would have thought to request documents from the SEC concerning their hoped-for investigation of BofI would have been if Erhart or a third party working in concert with Erhart gave him

-1- Case No. 2:16-mc-71

SMRH:478589530.2  BOFI'S SUPPLEMENTAL BRIEF IN OPPOSITION TO AURELIUS'
MOTION TO QUASH THE SUBPOENA ISSUED TO CENTURYLINK

the lead.  BofI has a right to know, through discovery, whether this individual is Aurelius or is working with him.

### 2. Aurelius' Statements Regarding Quick Bridge Funding

Aurelius' November 10, 2015 blog entitled "BofI: Boiler Rooms, Bad Loans, and Off-Balance Sheet Maneuvers Underpin Poorly Understood Risks" delves into what Aurelius contends is an undisclosed relationship between BofI and Quick Bridge Funding.  (Towill Decl., Ex. 14.)  Aurelius claims that Quick Bridge ropes unsuspecting individuals into loans "with ridiculously high interest rates, [that] must be paid daily, and have significant fees and penalties" and passes these loans onto BofI, which originates the loans and then "immediately assigns them off it's [sic] balance sheet."  (*Id.*, p. 6.)  The only specific information Aurelius cites in support of his theory, however, is a more than two year old announcement from June, 2014 by Quick Bridge that "it had closed a $35 Million credit facility with a 'Southern California Bank,'" which Aurelius claims is in fact BofI.  (*Id.*, p. 6.)  Aurelius also claims "[w]hile BOFI has not specifically disclosed the nature of it's [sic] relationship with Quick Bridge, publicly available bankruptcy records confirm a partnership of some kind."  (*Id.*)  It is curious why Aurelius would seek out old announcements by Quick Bridge and bankruptcy filings of individuals who defaulted on Quick Bridge loans in pursuit of information about BofI unless he was tipped off by someone who possessed inside knowledge that a relationship existed between BofI and Quick Bridge (which Aurelius falsely characterized).  Specific information regarding the June 2014 deal expressly mentioned by Aurelius was found on Erhart's personal devices.  (Supplemental Declaration of Polly Towill ("Supp. Towill Decl."), ¶ 4.)

Additionally, Aurelius' blog "reveals" that Quick Bridge previously did business as Blackrock Lending Group.  (Towill Decl., Ex. 14, p. 6.)  Aurelius claims that the State of Washington accused Blackrock of "perpetrating 'an advance fee loan scam' whereby 'consumers are told to wire the funds and the consumers never

receive their loans.'" (*Id.*)  It is not a coincidence that Erhart's personal devices contained documents that concern the relationship between Blackrock Lending and Quick Bridge.  (Supp. Towill Decl., ¶ 4.)

Aurelius' statements about Quick Bridge and Blackrock are merely a continuation of the short-selling scheme initiated by Erhart.  Erhart's October 13, 2015 Complaint alleges, without citing specifics, that BofI inappropriately excludes unfunded commitments for certain lines of credit from its Allowances for Loan and Lease Losses ("ALLL") calculation, which allegedly could have a material impact on BofI's earnings.  (Supp. Towill Decl., Ex. A at ¶ 36.)  By providing leads to Aurelius about the supposed undisclosed relationship between BofI and Quick Bridge (and Quick Bridge's supposed connection to Blackrock), Erhart is using Aurelius in an attempt to provide "validation" for his unsubstantiated and untrue allegations.

### 3. Aurelius' Statements Regarding Center Street Lending

Less than two weeks later, Aurelius published another blog, once again based upon information that appears to have been fed to him by Erhart.  Aurelius' November 19, 2015 blog entitled "BofI: Risky Loans to Undisclosed, Off-Balance Sheet SPEs Found Disguised Within Mortgage Portfolio" discussed Center Street Lending, which Aurelius claimed is "actively originating very bad loans that appear certain to result in high loss rates." (Towill Decl., Ex. 15, p. 3.)  In his blog, Aurelius revealed a "secret" — that "BofI has been clandestinely financing Center Street's bad loans through yet another undisclosed, off balance sheet, Special Purpose Entity." (*Id.*)

The forensic analysis of Erhart's personal devices revealed that Erhart had documents concerning loans to Center Street, including detailed information about each loan.  (Supp. Towill Decl., ¶ 4.)  These documents, along with any associated information, would have given Aurelius the building blocks for investigating a Center Street/BofI relationship.

4. <u>Aurelius' Statements Regarding Encore Capital and Propel Financial Services</u>

Aurelius' January 6, 2016 blog entitled "BofI: Undisclosed Related Party Dealings Found to Infect Audit Committee" discussed Encore Capital's acquisition of Propel Financial Services in May 2012 and claims that an important and completely undisclosed secret about the acquisition is that BofI financed the deal. (Towill Decl., Ex. 18.)  To prove his assertion, Aurelius traces an obscure path, beginning with an exhibit to Encore's 10-K filing and continuing through to documents filed by Propel with the Delaware Secretary of State in which, if one looks very closely, one can see BofI listed as a secured party on one of the forms. (*Id.*, p. 5-11.)  However, how Aurelius knew to start looking into the Propel deal at all, much less where to find the information, is a mystery, at least until one looks at the stolen BofI documents on Erhart's personal devices.

Erhart had documents concerning BofI's loan portfolio, including details of the Propel loan identified by Aurelius, as well as BofI's C&I Lending Strategic Plan, which includes information about Encore Capital.  (Supp. Towill Decl., ¶ 4.) This information establishes a foundation for Aurelius' blog and would have provided him with the leads he needed to write his blog.

5. <u>Aurelius' Statements about Private Loans to Individuals Associated with BofI's Audit Function</u>

There are other examples throughout Aurelius' articles of information that Aurelius would not have known absent someone pointing him towards it.  In Aurelius' January 6th blog, he discussed mortgages to individuals associated with BofI's audit function, including Audit Committee Chair Paul Grinberg, Chief Compliance Officer John Tolla, and former Internal Audit head Jonathan Ball. (Towill Decl., Ex. 18, p. 12, 15-17.)  Aurelius knew their home addresses and went so far as to dig up information from the recorder's offices about the mortgages on their properties.  (*See id.*)  Not coincidentally, Erhart was as a staff internal auditor

and member of the very same department as the individuals singled out by Aurelius' blog. More importantly, however, BofI's system logs demonstrate that Erhart improperly accessed employee loan files before he left BofI. Furthermore, he had an axe to grind with BofI.

6. <u>Aurelius' Statements about BofI's Structured Settlement Business</u>

In the November 10th blog, Aurelius discusses BofI's structured settlement business, in which BofI purchases lottery winnings and structured settlements from individuals, which Aurelius improperly characterizes as unsustainable and fraught with "significant regulatory risks." (Towill Decl., Ex. 14, p. 13.) Aurelius specifically discusses a state court case from Suffolk County, New York in which a court did not approve the sale of an individual's structured settlement to BofI. (*Id.*) Aurelius could not possibly have known to search the Suffolk County court records for that action unless he had been told to do so by someone who had knowledge of BofI's structured settlement business. While an internal auditor at BofI, Erhart conducted an audit of BofI's structured settlement activities. Erhart's knowledge and information of BofI's structured settlement business would have given Aurelius the information he needed to seek out specific cases in which BofI sought to purchase structured settlements.

7. <u>Aurelius' Statements Regarding OnDeck</u>

In his November 10th blog, and again in his May 10, 2016 blog, Aurelius discusses BofI's relationship with OnDeck, which Aurelius claims may be using BofI's federal banking charter to help OnDeck "in circumventing state banking laws that otherwise might prohibit the loans from being originated." (Towill Decl., Ex. 14, p. 5; Ex. 21.) In the blogs, Aurelius tries to paint BofI and OnDeck as members of a conspiracy to write bad loans. (*Id.*) However, Aurelius would not have known to investigate OnDeck or its relationship to BofI had he not been provided with a lead from an inside source. At the time, OnDeck was a newly public company and was largely perceived as a financial technology company rather

than a lender.  Thus, absent an inside tip to investigate OnDeck, Aurelius would have had no reason to look into a relationship between BofI and OnDeck in the first place.

### 8. Aurelius' Identification of Court Records Involving BofI-Issued Loans

Similarly, Aurelius' November 10th blog references "dozens" of court records that he contends show loans originated by BofI that were then immediately transferred off of BofI's books via Quick Bridge. (Towill Decl., Ex. 14, p. 6-10.)  It does not appear that BofI is a named party to any of the actions discussed by Aurelius; rather, he claims that BofI merely originated the loans. (*See id.*)  Thus, BofI's name can be found *within* certain publicly-filed documents, but only if Aurelius was told where to locate those documents.  (*See id.*)

### 9. Aurelius' Statements Evidence a Classic Short-Selling Scheme and are Proof of BofI's Damages against Erhart for Unlawful Dissemination

Within one week of the filing of Erhart's Complaint, Aurelius unleashed a series of blogs that discuss the allegations and purport to investigate and confirm the truth of the allegations. (*See, e.g.,* Towill Decl., Exs. 12, 13, 16.)  The Court cannot discount these links between Erhart and Aurelius simply because Aurelius published his blogs after Erhart filed his lawsuit.  To the contrary, the timing of Aurelius' negative publicity is part of the classic short-selling playbook, designed to continue the negative publicity about a target company after the initial stock plunge so that short-sellers can wrest maximum profits by continuing to drive BofI's stock price downward.

These blogs are also significant for another reason – they are evidence proving BofI's damages against Erhart as a result of his unlawful dissemination of BofI's confidential information.  As the OCC has confirmed, the Complaint itself contains non-public supervisory information that should not have been disclosed.  Any further dissemination as a result of Erhart's initial publication, particularly where that dissemination is designed to further injure BofI by driving its stock

downward, is directly relevant to BofI's damages in its action against Erhart. BofI therefore has a right to establish its damages by showing that short-sellers such as Aurelius used even the information in the Complaint to drive down the stock price.

**B.     BofI's Interest in and Need for this Information Outweighs Aurelius' First Amendment Rights, Which are Limited**

Because Aurelius used the above information to attack BofI in an admitted attempt to strengthen his short positon, BofI contends Aurelius' speech is commercial speech and thus is only subject to limited First Amendment protections. Regardless of the applicable test, however, BofI has demonstrated the required nexus between Erhart's theft from BofI and dissemination of BofI's confidential information with Aurelius' blogs. The Court has wide discretion in balancing Aurelius' right to anonymous blogging with BofI's rights to seek discovery from persons who appear to have information originally stolen from BofI. Here, the balance must weigh in BofI's favor.

The information referenced in Aurelius' blogs appears to have come from an inside source. Although the information Aurelius references may be accessible to the public (after considerable research), by its very nature it is not something one would have readily located or even thought to look for without Erhart's underlying wrongful dissemination. Whether or not the information Aurelius publishes can also be found through "public" sources, this does not allow Aurelius to benefit from Erhart's theft. Furthermore, the information stolen by Erhart was not to be disseminated. Judge Bashant in the underlying Southern District action has already issued an order restraining Erhart from disseminating any of the information he stole. (Towill Decl., Exs. 2, 3.) BofI's right to ask Aurelius the source of his continuing blogs (including as recently as last month) weighs in favor of Aurelius having to come forward. This is also true where Erhart's blogs repeat allegations in Erhart's Complaint, which contains stolen information.

Erhart's denial that he has provided information to Aurelius does not weigh

1 against BofI's interest in and right to discover Aurelius' identity. Given Aurelius' anonymity, and Erhart's testimony that he does not know Aurelius' identity, Erhart cannot possibly know whether he has or has not directly or indirectly provided information to him. Moreover, Erhart has acknowledged that he has provided information about BofI to third parties, including but not limited to Erhart's counsel, Carol Gillam. In the underlying Southern District action, Magistrate Judge Stormes ordered the extraordinary remedy of allowing a subpoena of Gillam for her communications with third parties regarding BofI. (Towill Decl., Ex. 5, p. 10.) The evidence obtained in response strongly suggests that Erhart is trying to get around the restraining order by disseminating the information indirectly through third parties, such as his counsel, and also likely Aurelius. Whether Erhart, or one of the people to whom he provided the information, is Aurelius' source will only be resolved if BofI is allowed to determine Aurelius' identity.

## II. ALTERNATIVELY, THE COURT MAY ORDER DISCLOSURE OF AURELIUS' IDENTITY PURSUANT TO A PROTECTIVE ORDER

If the Court, despite the foregoing examples, finds that BofI's rights to identify those unlawfully disseminating BofI's confidential information and prove its resulting damages do not outweigh Aurelius' right to anonymous speech, the Court may consider ordering disclosure to the parties and counsel only, pursuant to an acceptable protective order. There is precedent for such an order.

In *Lefkoe v. Jos. A Bank Clothiers, Inc.*, 577 F.3d 240 (4th Cir. 2009), a third party witness who sought to remain anonymous sought protection from the court where his deposition was to be taken. That court permitted the deposition of the anonymous speaker, subject to a protective order requiring counsel for the parties to keep his identity confidential and providing for modification of the protective order by the court where the underlying action was pending. 577 F.3d at 243. The court with jurisdiction over the underlying matter ultimately modified the protective order and authorized disclosure of the anonymous speaker's identity to the parties in that

1 action, while still ordering his identity be kept confidential from the public at large.
2 On appeal, the Fourth Circuit affirmed the court's ruling permitting disclosure of the
3 anonymous speaker's identity pursuant to the protective order.

4     A similar order may be appropriate here.  While BofI, as the victim of a
5 coordinated attack, should be allowed to publicly identify Aurelius in furtherance of
6 its rights to conduct discovery of those who appear to have information originally
7 stolen from BofI, at a minimum, BofI is entitled to even a private disclosure of
8 Aurelius' identity pursuant to protective order.  Even under a balancing test,
9 Aurelius' First Amendment rights should not entirely eclipse BofI's equally valid
10 rights to prove its damages and identify those working with Erhart to accomplish his
11 unlawful scheme.

### III. CONCLUSION

13     Based on the foregoing, in conjunction with the prior briefing and oral
14 argument in this matter, BofI respectfully requests that the Court deny Aurelius'
15 motion to quash the subpoena issued by BofI to CenturyLink.

16 Dated:  July 19, 2016

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By  */s Polly Towill*
POLLY TOWILL
Attorneys for Respondent
BofI FEDERAL BANK