1  LOCKE LORD LLP
   Priya Sopori (SBN: 210837)
2  psopori@lockelord.corn
   Kyle Foltyn-Smith (SBN: 307835)
3  kyle.foltyn-smith@lockelord.corn
   300 South Grand Avenue, Suite 2600
4  Los Angeles, CA 90071 213- 485-1500

5
   Attorneys for Petitioner
6  AURELIUS

7                    UNITED STATES DISTRICT COURT

8                    CENTRAL DISTRICT OF CALIFORNIA

9  AURELIUS, an individual,              Case No.: 2:16-MC-00071 DSF (FFMx)
                                         Honorable Frederick F. Mumm
10            Petitioner,
                                         **AURELIUS' REPLY TO BOFI FEDERAL**
11     vs.                               **BANK'S SUPPLEMENTAL BRIEF IN**
                                         **OPPOSITION TO AURELIUS' MOTION**
12 Bofl FEDERAL BANK, a federal savings bank,  **TO QUASH THE SUBPOENA ISSUED TO**
                                         **CENTURYLINK COMMUNICATIONS,**
13            Respondent.                **LLC**

14                                       **[Declaration of Kyle Foltyn-Smith Filed**
                                         **Concurrently]**
15

16

17

18

19

20

21

22

23

24

25

26

27

28

99998-00021/8196661.1

AURELIUS' REPLY TO BOFI FEDERAL BANK'S SUPPLEMENTAL BRIEF IN OPPOSITION TO AURELIUS'
MOTION TO QUASH THE SUBPOENA ISSUED TO CENTURYLINK COMMUNICATIONS, LLC

## I.      INTRODUCTION

The Court granted Bofl leave to identify examples of "confidential" information that Aurelius received.   Bofl has provided numerous examples of Aurelius' use of *publicly* available information.   Nowhere in its brief is there any example of any information in Aurelius' articles that is not or was not in the public domain.

Instead, Bofl asserts that the public information could not have been found unless Aurelius had been "tipped off" or "pointed to" it.   According to Bofl, it would be "improbable" that anyone could have discovered, for example, the business relationship between Bofl and Quick Bridge. Bofl has, however, overlooked the obvious: the internet.   Bofl, as banks routinely do, has filed financial statements disclosing the names of its debtors.   No one would need an informant to discover the businesses Bofl is connected to.   Individuals familiar with the financial industry would know of the existence of the "Secured Party Search" tool of the State of California.   After typing in "Bofl," a researcher could, with a few clicks and a little doggedness in pursuing the names turned up, find the information that Bofl suggests can only be found with the help of Deep Throat.   Everything that BofI contends could not be found without a tip, can in fact be found with internet searches, as Aurelius' counsel has determined for herself.

Furthermore, the burden of proof is not on Aurelius to show how he found information in the public domain.   The burden is on Bofl to prove its contention that public information could not have been found without BofI's confidential information.   Yet Bofl has not submitted any such evidence.   BofI's entire supplemental brief is written as if the research had been done in the previous century.   There is no discussion of public data bases or search engines, nor any declaration showing that no logical search terms or websites would reveal the information in Aurelius' articles.   There once was a time when finding information in court filings, bankruptcy filings, UCC filings, and old newspapers required substantial leg work, travelling to archives and painstaking turning pages of hard copies looking for a name.   But not anymore.   Bofl's contention that it takes confidential information to locate public information is not only a oxymoron, it is obsolete.   BofI's supplemental reply would fail Journalism 101.

## II.     ARGUMENT

### A.     BofI Fails to Produce the Evidence it Said it Had: That the Public Information in Aurelius' Articles Could Only Have Been Found with Confidential Information in Erhart's Possession.

Preliminarily, in discussing the location of public information, BofI never provides any authority that location is itself confidential information.   That is, assuming for the sake of argument an employee such as Erhart had discovered, for example, a bankruptcy filing showing a connection between BofI and the debtor, BofI has never provided any authority for its theory that it is wrongful for an employee to divulge the public location of public information.   After all, the location of public information is itself in the pubic domain.   BofI has not cited any court that held that the public location of public information would ever qualify as one person's or entity's "confidential" or "trade secret" or "proprietary" information.   This Court need not, however, wrestle with that novel legal issue because this motion can be resolved on factual grounds; that is, the failure of evidence that a researcher would need an informant's help to find the information Aurelius found.

>    *1.    BofI does not provide any examples of information that could only have been uncovered with BofI's so-called confidential information.*

The Court instructed BofI to provide examples where confidential information recovered from Erhart would have had to have been used by Aurelius to find the public information in his articles.   BofI baldly asserts, phrased in various ways, that the information Aurelius found is so obscure and so well-hidden that no one could have found it without being tipped off.   But every one of its examples disproves its assertion.

**BofI's Lien Filings Show The Businesses It Finances.**   Several of BofI's examples concern articles about the business dealings between BofI and a number of other entities, such as Quick Bridge, Blackrock Lending Group, Center Street, Propel, OnDeck.   (Supp'l Br. at 2-6.) Each one of these business relationships can be found be using only a computer, common knowledge of the operations of financial institutions, familiarity with previously published works, and persistence.

3

1    For example, the State of California has a search tool, "California Secured Party" located

2    at the California Business Portal that will identify every lien that a secured lender has filed, and

3    the identity of the debtor.   (Declaration of Kyle Foltyn-Smith dated July 26, 2016 "Foltyn-Smith

4    Dec.," ¶ 3.)   Anyone familiar with financing would know that lenders customarily secure their

5    loans by recording liens and how to find those liens.[1]   After all, the very purpose of recording

6    liens is to put the world on notice.   It is nonsense for BofI to simultaneously take the position that

7    the entire world is on notice that it has a secured lien and at the same time assert that no one would

8    know that.

9    In any event, as explained in more detail in the accompanying declaration, by paying a

10    nominal fee of five dollars anyone can learn the name of a secured party and the debtor.   With a

11    few key strokes and clicks, both Quick Bridge and Blackrock Lending show up as debtors of BofI

12    within the first sixty entries.   (Id., Exhibit "Ex." A.)

13    Obviously it takes some time to follow up on those leads.   But when the *New York Times*

14    had already alerted the public that something was rotten in Denmark, a curious journalist would

15    naturally want to know what kinds of businesses BofI was financing.   Like a detective following

16    up on leads, the next step would be to search for public information about the businesses that

17    popped up.   BofI points out that Aurelius referenced dozens of court records showing loans

18    originated by BofI.   BofI asserts that those loans could not have been found because BofI was not

19    a named party in the caption of the lawsuits.   But following the publicly disclosed connections

20    from BofI to Quick Bridge to WCL Holdings, anyone could find the court records that mention

21    BofI.   (Foltyn-Smith Dec. ¶¶ 4-5, Ex. B, Ex. C.)   Notably, BofI concedes that BofI's name "can

22    be found within certain *publicly filed documents*."   (Supp'l Br. at 6:10 (emphasis added; original

23    emphasis deleted).)

24    Finally, BofI notes that some of Aurelius' information is the same as that in possession of

25    Erhart.   That is no surprise.   BofI alleges that Erhart stole massive quantities of information.   It

---

[1]    Furthermore, California is not the only logical state to search for liens.   Business people
know that Delaware is a popular state within which to incorporate.   A search of BofI filings in
Delaware would turn up Propel Financial and Center Funding, and research on those entities
would produce the facts that Aurelius cited in his articles.

4

would follow logically that within Erhart's trove would be public information.   If Erhart had

stolen a phone book, no inference of wrongful disclosure could be drawn because a researcher

could find some phone numbers using other sources.

   **A researcher does not need home addresses to find someone's mortgage.**   In what is

possibly the most telling example of BofI's disingenuous claim that it takes confidential

information to find public information, BofI points to Aurelius' article in which he discussed

mortgages to individuals associated "with BofI's audit function, including Audit Committee Chair

Paul Grinberg, Chief Compliance Officer John Tolla, and former Internal Audit head Jonathan

Ball."   (Supp'l Br. at 4:23-25.)   BofI asserts – again without evidentiary support – that "Aurelius

knew their home addresses and went so far as to dig up information from the recorder's offices

about the mortgages on their properties."   (Id. at 4:26-28.)   The flaws in BofI's assertions begin

with the fact that Aurelius did not break the news of BofI's insider loan program.   That distinction

belongs to an earlier article authored by a different Seeking Alpha contributor.

(http://seekingalpha.com/article/3641526-buyer-beware-bofi-related-party-loans).   That article

specifically addressed Paul Grinberg's mortgage and cites to a declaration of Johnathan Ball that

mentions John Tolla.   (Foltyn-Smith Dec. ¶¶ 6, 9; Ex. D.)   An inquisitive researcher would ask

himself, it there's one such loan, might there be others?   It would be worth investigating because

undisclosed, related party dealings are potentially violations of securities laws.   Perhaps others in

BofI's audit and compliance department (the names are public) may have been compromised.   In

that BofI is headquartered in San Diego, a search of the San Diego County Recorder's records is a

logical place to start.   The San Diego County Recorder's Office has a tool that allows anyone to

search by name (no need for an address) to identify all associated property transactions for free

(https://arcc-acclaim.sdcounty.ca.gov/).   (Foltyn-Smith Dec. ¶ 7.)   A simple search of the last

name "Ball" reveals a mortgage from BofI in March 2012 to Jonathan Ball.   (Id., Ex. E.)   Other

services, such as PropertyRadar, are available online for a fee and provide even more powerful

research tools, such as the ability to search all property records and related documents across all of

California rather than just a county-by-county basis.

An additional reason disproving BofI's assertion that its insider loans could not be discovered without Erhart's help is that Aurelius' article included a loan that was made *after* Erhart's employment terminated.   John Tolla's mortgage was dated December 18, 2015, nine months after Erhart left BofI in March 2015.   (Foltyn-Smith Dec. ¶ 7, Ex. F.)   This is but one example of information in Aurelius' articles that refer to events and transactions that occurred well after Erhart left, which BofI does not address.   (Foltyn-Smith Dec. 8, Ex. G.)

**BofI's Lawsuit in Suffolk County Court.**   BofI points to a court ruling in a court in Suffolk County, New York and asserts "Aurelius could not possibly have known to search the Suffolk County court records for that action unless he had been told to do so by someone who had knowledge of Bofl's structured settlement business."   (Bofl Supp'l Opp at 5:12-14.)   But a person with some knowledge of the business of purchasing structured settlements (which would include many lawyers) would know that some states require court approval before the structure settlement is transferred.   Moreover, even if a researcher was not specifically looking for approvals of structured settlement purchases, a researcher would still be interested in lawsuits by or against BofI.   After all, having already discovered any number of BofI improprieties, an investigator would naturally wonder how BofI has fared in court.   Once again BofI, whether intentionally or not, has overlooked the free online legal research tool of Justia.com.   Typing "BofI Federal Bank" into the search box at the top of the home page produces a list of cases.   As of the date this supplemental reply was filed, the very first result is the Suffolk County case that BofI claims "no one could possibly have known."   (Foltyn-Smith Dec. ¶ 10, Ex. H.)   Exactly the opposite is true.   Everyone curious about BofI litigation would know.

**Bofl's Unfounded Suspicious based on Erhart's conduct.**   Bofl's very first example is a summary of its allegations against *Erhart*.   According to Bofl, Erhart "appears" to have been "coordinating' with unnamed third parties.   (Supp'l Br. 1:19-21.)   BofI's recitation shows no connection to Aurelius whatsoever.   Presumably Bofl considers its first example its most compelling, and yet it has nothing to do with Aurelius.

As to Erhart, Bofl asserts there was some scheme of a "short-sell attack" and that assertion is based on a request to the SEC for an investigation.   BofI presented no evidence that Aurelius

had anything to do with that request.   BofI also notes that the SEC received FOIA requests, but again no evidence whatsoever that Aurelius requested that information.   Thus, Bofl's first example aptly illustrates the gapping holes in its evidence and the irrational leaps in its logic.   No doubt, Bofl does not welcome a government investigation, but Bofl's unsubstantial accusations and baseless speculation about Aurelius suggest it is trying to discourage him from reporting unflattering truths that, if read by SEC investigators, might well aid them in their work.   Furthermore, under BofI's logic, it could depose every journalist that reported on BofI's alleged misconduct.

**Lawful Conduct is Not Evidence of Unlawful Conduct.**   Finally, in Bofl's ninth and last example, Bofl concedes that Aurelius did not start writing until after Erhart filed suit — and in all candor Bofl should have also disclosed that Aurelius did not start writing until after the New York Times reported on the *Erhart* lawsuit.   Furthermore, it should also have mentioned that other blogs have likewise taken note of Erhart's allegations.   Importantly, Bofl acknowledged that Aurelius' writings are intended to "*confirm the truth of [Erhart's] allegations.*"   (Bofl Supp'l Opp. at 6:15-16 (emphasis added).)   That is a remarkable admission.   Stripped to its essence, Bofl is contending that a journalist's pursuit of truth is proof of wrongful conduct.   The consequences of Bofl's argument, were it to succeed, is that truthful facts and constitutionally protected opinions could not be published because a company might believe they were to blame for falling stock value.   If such reports are published, according to Bofl, the writer should be exposed and deposed.   Bofl is doing what villains in comic books do.   When their schemes are upended by a masked crusader, they seek his identity so as to target him.   Such conduct is amusing in comic books; ruthless in business; but fortunately, prohibited by the Constitution.

### 2.   *Bofl Misstates the Principles of Probability.*

Bofl's arguments fail for an independent reason.   Bofl repeatedly claims that it would be "improbable" for Aurelius to uncover the information he used in his articles unless he had the "building blocks" found in the confidential information.   As the Court may recall from the last hearing, Bofl used the (perhaps hypothetical) example of a house in Cambodia.   In so many words, BofI asserted it would be statistically improbable for Aurelius to know of a house in

1  Cambodia without Erhart placing his finger on a map.   As explained above, however, Aurelius

2  needed only electronic assistance to find his information.   But even if he BofI had a real-life

3  example about a house in Cambodia, its probability argument would still be meritless.

4          Its error can be illustrated by a thrifty shopper who searches bargain bins.   The shopper

5  finds a perfect pair of argyle socks of an unusually bright blue color.   BofI would say, of all the

6  socks in all the bargain bins in the world, the shopper could not have found that particular pair of

7  socks with that style and color without a tip from an store employee.   The shopper however

8  would respond, "I was not looking for bright blue argyle socks.   In fact, I was not necessarily

9  looking for socks at all.   I was just looking for something I might wear.   It just so happened to be

10  bright blue argyle socks.   I would have been happy with a T-shirt or a belt if I had found those.

11  There's always a good chance of finding something useful when you go looking in bargain bins."

12          Here, BofI has assumed that Aurelius went looking for the exact pieces of information he

13  found.   But there is no reason to suppose that.   When a researcher goes looking for something

14  useful, he has not pre-determined what that useful information will be.   If he were to do that, he

15  might overlook all the other useful information he came across.   Aurelius would not, for example,

16  go looking for a lawsuit in Suffolk County.   He would have no reason to believe there was a

17  lawsuit there.   But a reseacher would logically look for lawsuits involving BofI, would use a

18  website that listed lawsuits, and thus would come across that lawsuit.   Aurelius would not—and

19  would not need—to know in advance what he might find.   He had only to make educated guesses

20  of websites that would have the best chances of turning up something useful.   Moreover, his

21  chances of finding something useful are greatly enhanced by the phenomenon that a business with

22  questionable business practices does not usually cross the ethical line only once.   It does not take

23  an insider to tell a journalist that where there's questionable conduct, the odds are very good,

24  there'll be other such conduct.

25      **B.      Aurelius' First Amendment Right in Remaining Anonymous Outweighs BofI's**

26              **Makeweight Alleged Need To Unmask Him.**

27          BofI appears unable to resist rearguing points already decided by the Court.   The Court

28  did not ask for nor grant leave to supplement other points already fully briefed and argued as to the

application of the First Amendment.   In any event, the Court's observations at the hearing were correct:

> 1.   *Aurelius has a strong first amendment interest in remaining anonymous.*

Both the New York Court and this Court (at the hearing) agreed that Aurelius' First Amendment interest in remaining anonymous is a core interest.   BofI again (and once again incorrectly) characterizes Aurelius' speech as commercial speech.   For reasons already briefed and argued, it is not.   But tellingly, when BofI goes afield to quarrel with the Court, it ought to at least disclose what the Court said as well as the reasons the Court gave and explain any alleged error.   BofI has not done that.   BofI's repetition alone does not merit further discussion.

> 2.   *Aurelius should not be punished for finding and reading Erhart's Complaint once it was filed.*

BofI argues that Aurelius should be unmasked because "Erhart's blogs repeat allegations in Erhart's Complaint, which contains stolen information."   (Supp'l Br. at 7:26-27.)   Erhart's complaint is, of course, part of the public record and readily available on PACER.   Anyone can repeat the allegations in it.   Even if information included might at one time have been confidential, it was no longer confidential when the complain was filed.   No rational inference of wrongdoing can be inferred from the public's right to quote a complaint.

> 3.   *BofI's misrepresentations.*

BofI states that "Aurelius used the above information to attack BofI in an admitted attempt to strengthen his short position."   (Supp'l Br. at 7:6-7.) No citation to any evidence follows that assertion.   There is no quotation from Aurelius as to any such admission.   To be sure, Aurelius disclosed to his readers that he has taken a short position.   That gives the reader useful information to weigh his opinions, and it also shows that Aurelius is willing to put his money where his mouth is.   Such disclosures are commendable; not condemnable.   BofI's inflammatory rhetoric, untethered to any evidence, is simply a variation on the punch line to the old lawyer's joke.   Instead of the lawyer pounding the table because the facts and law are against him, BofI resorts to pounding the masked man.

9

**C.      A Protective Order Would Not Provide Sufficient Protection Of Aurelius'**

**First Amendment Rights.**

As discussed above, Bofl has not cleared the initial hurdle of showing Aurelius used confidential information at all.   Even if the First Amendment were not implicated, Bofl has not justified a deposition of a non-party with no connection to the conduct that allegedly occurred months before Aurelius wrote his first article.   The expense, inconvenience and rigors of a deposition are not ameliorated by an order that the deponent's identity not be disclosed.

Bofl points out that a protective order was issued in *Lefkoe v. Jos. A. Bank Clotheriers, Incorporated*, 577 F.3d 240 (4th Cir. 2009), but omits any mention of the court's reasoning.   As discussed in previous briefing, the facts in that case are dramatically different.   Through false accusations, the anonymous speaker "took deliberate and successful actions . . . [to] drive down the market price of [Jos. A. Banks's] stock during the proposed class period."   Id. at 244 [Aurelius' Reply Brief at 6:20-26].   Here, there are no falsities.   The facts are true and the opinions fully protected by the First Amendment.

Even if a balancing test applied, there is really nothing on BofI's side of the scale.   Bofl relies on speculation to justify a deposition that is nothing more than a fishing expedition.   On the other side of the scales, a deposition would chill Aurelius' First Amendment rights by harassing him, and such tactics may well dissuade others from trying to expose corporate wrongdoing, and ultimately deprive the public of facts and valuable analysis that they could use to decide with whom to do business.

**III.      CONCLUSION**

For the foregoing reasons, Aurelius respectfully requests that the Court quash the subpoena at issue.

Respectfully submitted,

DATED: July 26, 2016                    LOCKE LORD LLP


                                        By  /s/ Priya Sopori
                                           PRIYA SOPORI
                                           KYLE FOLTYN-SMITH
                                           *Attorneys for Petitioner*
                                           *AURELIUS*

AURELIUS' REPLY TO BOFI FEDERAL BANK'S SUPPLEMENTAL BRIEF IN OPPOSITION TO AURELIUS'
MOTION TO QUASH THE SUBPOENA ISSUED TO CENTURYLINK COMMUNICATIONS, LLC