UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AURELIUS, Petitioner, v. BOFI FEDERAL BANK, Respondent. | Case No. MC 16-71 DSF (FFM) ORDER GRANTING MOTION TO QUASH SUBPOENA |

**INTRODUCTION**

Before the Court is a motion filed under the pseudonym Aurelius to quash a subpoena served on CenturyLink Communications, LLC ("CenturyLink") by BofI Federal Bank ("BofI"). (Dkt. No. 1.) The subpoena seeks to unmask the identity of Aurelius in order to take Aurelius's deposition to ascertain if he has been working with Charles Erhart, the defendant in an action filed by BofI in the Southern District of California. BofI opposed Aurelius's motion to quash on June 14, 2016 (the "Opposition" or "Oppo."). (Dkt. No. 15.) For the reasons discussed below, Aurelius's motion to quash the subpoena is GRANTED.

/ / /

/ / /

**BACKGROUND**

At the heart of this dispute is a suspected stock market manipulation scheme. At issue is whether BofI may uncover the true identity of an anonymous internet blogger who writes under the pseudonym Aurelius, and who it believes played a key role in a "short attack"[1] against BofI stock. Whether BofI may uncover Aurelius's identity depends on whether it can show that Aurelius is in fact part of the scheme.

On October 13, 2015, Charles Erhart, a former employee of respondent BofI, filed a "whistleblower" complaint against BofI alleging violations of both the Sarbanes Oxley and Dodd Frank Acts. (Dkt. No. 2, Aurelius's Request for Judicial Notice ("RJN"), Ex. A.) That same day, before the complaint was filed, the *New York Times* published and circulated an article containing information about BofI that was purportedly leaked to the newspaper by Erhart. (Decl. of Polly Towill, Ex. 8.) BofI later filed a lawsuit against Erhart in the Southern District of California, alleging various causes of action related to his acquisition of BofI's information and the subsequent leak. (RJN, Ex. B.)

While investigating Erhart's actions, BofI discovered multiple articles written in late 2015 and early 2016 by an anonymous online blogger, Aurelius, on the financial blog website Seeking Alpha. (Oppo. at 9.) These articles painted a grim picture of BofI's financial outlook and warned investors of the disastrous economic consequences that Aurelius apparently believed lay in store for BofI and its shareholders. (Decl. of Polly Towill, Exs. 11–22.) As a result, BofI began to suspect that Aurelius was coordinating with Erhart as part of a short attack against BofI. (Oppo. at 9–12.) Seeking to identify and then depose Aurelius about Erhart's leaks and the suspected

[1] A "short attack," also known as a "short and distort" scheme, is "[a]n illegal practice employed by unethical internet investors who short-sell a stock and then spread unsubstantiated rumors and other kinds of unverified bad news in an attempt to drive down the equity's price and realize a profit." *Short and Distort*, Investopedia, http://www.investopedia.com/terms/s/shortanddistort.asp (September 13, 2016).

conspiracy, BofI served a subpoena on Seeking Alpha demanding that the website identify the anonymous poster. (Decl. of Polly Towill, Ex. 23.)

After Seeking Alpha refused to comply with the subpoena, on January 20, 2016, BofI filed a motion to compel in the District Court for the Southern District of New York. (Decl. of Polly Towill, Ex. 24.) There, BofI argued that it required Aurelius's identification information so that BofI could determine whether Erhart had provided any information to third-parties, or whether he and Aurelius were co-conspirators in a market manipulation scheme. (RJN, Ex. D at 6–8.) Judge Oetken denied BofI's motion on February 9, 2016, finding that BofI failed to satisfy the Second Circuit's standard for overcoming the right to anonymous speech under the First Amendment. (S.D.N.Y. Hearing Transcript ("HT") at 30:6–31:12; *see also* RJN, Ex. F.)

Having failed to unmask Aurelius in the Southern District of New York, BofI continued to mine for information linking Aurelius to Erhart's suspected market manipulation scheme. During this quest for evidence, BofI allegedly discovered that Erhart's attorney had begun providing details about BofI to the author of the October 13, 2015, *New York Times* article as early as May 2015. (Decl. of Polly Towill, Ex. 6 at 42–43.) Moreover, BofI asserts that Erhart and his attorney had begun disseminating information regarding BofI to known short sellers in the period leading up to the publication of the *New York Times* article and the filing of Erhart's complaint. (Oppo. at 7–9; Decl. of Polly Towill, Ex. 6.)

Still pursuing Aurelius's identity in order to gain information on his possible involvement with Erhart, on May 11, 2016, BofI served a subpoena on CenturyLink, seeking the identity of the person to whom BofI had traced Aurelius's IP address. (Decl. of Polly Towill at ¶ 36.)

On May 31, 2016, Aurelius initiated the instant proceedings by filing a motion to quash the subpoena served on CenturyLink. (Dkt. No. 1.) In that motion, Aurelius contends that CenturyLink should not be required to turn over any identifying

/ / /

information because Aurelius has a First Amendment right to anonymous speech. (*See generally id.*)

Based on the information uncovered in its latest search, BofI alleges in the Opposition to the motion to quash that Erhart and Aurelius were both part of a short attack aimed at driving down the price of BofI stock. (Oppo. at 7–9.) In support of this contention, BofI points to Erhart's dissemination of information before the filing of the complaint as a clear indication of a scheme by Erhart to drive down the stock price of BofI. (*Id.* at 8–10; Decl. of Polly Towill, Ex. 6.) As evidence that Aurelius was involved in this scheme, BofI points to the fact that Aurelius did not begin to post articles about BofI until after Erhart had filed his complaint, *i.e.* after the scheme had commenced. (Oppo. at 8–10; Decl. of Polly Towill at ¶¶ 19–20.) As further proof that Aurelius and Erhart are co-conspirators, BofI asserts that, while Aurelius has not posted any non-public information, the information he posted is of such a nature that he would not have discovered it had not Erhart or another person directed his efforts. (Oppo. at 4.) Indeed, BofI asserts that Aurelius is either a pseudonym for Erhart himself or, at the very least, Aurelius has been coordinating with Erhart to post unfavorable information about BofI on Seeking Alpha.

## DISCUSSION

### A. Legal Standard

Although the Ninth Circuit has not definitively set forth a standard for analyzing First Amendment claims to anonymity, it has provided some guidance for resolving such issues. *See generally In re Anonymous Online Speakers*, 661 F.3d 1168 (9th Cir. 2011). In this regard, in *In re Anonymous Online Speakers*, the Ninth Circuit interpreted its holding in *Perry v. Schwarzenegger* as establishing two elements for the analysis. *Anonymous Online Speakers*, 661 F.3d at 1174 (citing *Perry v. Schwarzenegger*, 591 F.3d 1147, 1164 (9th Cir. 2010). First, whether the opponent of disclosure has made a *prima facie* case of an arguable First Amendment interest and, if so, second, whether the party seeking the disclosure has demonstrated a sufficient need

for the discovery to counterbalance that interest. *Id.* District courts throughout the Ninth Circuit have also developed frameworks for addressing such claims. *See, e.g.*, *Highfields Capital Mgmt., LP v. Doe*, 385 F.Supp.2d 969 (N.D. Cal. 2005); *Doe v. 2TheMart.com*, 140 F.Supp.2d 1088 (W.D. Wash. 2001).

Although the tests are phrased somewhat differently in the Ninth Circuit and the Second Circuit, the essence of the inquiry is a comparison of the strength of the First Amendment interests asserted with the need and otherwise unavailability of the information requested.[2] *Compare Anonymous Online Speakers*, 661 F.3d at 1174 *with Arista Records, LLC. v. Doe 3*, 604 F.3d 110, 118–19 (2d Cir. 2010). In denying BofI's motion to compel in the Southern District of New York, Judge Oetken found that BofI had failed to demonstrate that Aurelius was conspiring with Erhart. (HT at 29:18-25.) BofI now contends that since that hearing it has uncovered sufficient evidence of Aurelius's involvement to overcome the asserted First Amendment interests.

B. Analysis

1. First Amendment Interest Involved

The Court first notes that Judge Oetken expressly found a strong First Amendment interest in this case. (*See* HT 28:15-20, "I find that [Aurelius's posts] involve core speech, in fact, core noncommercial speech in a way that is clearly stronger in terms of what needs to be protected than the *Sony Music* and *Arista* cases. There might be elements of commercial speech here, but I think this clearly involves speech on matters of public interest as well.") BofI's argument that Judge Oetken overestimated the strength of the First Amendment interests asserted here is unpersuasive.

In this regard, BofI argues that the First Amendment offers less protection to Aurelius's identity because the blog posts are misleading and designed to negatively

[2] The Court need not consider the exact threshold that BofI must meet because, as discussed *infra*, it fails to make more than a minimal showing of a need for the evidence sought. On that basis, the Court also declines to discuss the potential unavailability of the evidence BofI seeks.

impact BofI's stock price. (Oppo. at 9–11.) However, BofI fails to identify any fact stated in any of the postings that is demonstrably false. While the postings include a number of statements suggesting that the future performance of BofI shares might be worse than speculated by the mainstream stock analysts, these statements are merely opinions that do not imply a provably false fact. (*See, e.g.*, Decl. of Polly Towill, Exs. 11–18.) Significantly, these postings describe in detail the facts upon which the opinions are based. *See Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995) ("[W]hen a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment."). Notably, many of the comments to the postings disagree with the opinions Aurelius drew from the facts, but do not dispute the facts. (*See, e.g.*, Decl. of Polly Towill, Ex. 16 at 152–55, Ex. 18 at 202–05.) That the opinions are unfavorable to BofI does not render them without First Amendment protection.

2. Need to Identify Aurelius

The Court must balance Aurelius's rights against the strength of BofI's showing that it has a need to uncover Aurelius's identity. BofI asserts that it requires Aurelius's identity so that it may depose Aurelius on the following issues: (1) whether Aurelius and Erhart were cohorts in a market manipulation scheme and (2) whether Erhart provided Aurelius with any confidential information. (Oppo. at 16–17.) As Judge Oetken already has found, before BofI can pierce Aurelius's First Amendment right to anonymity, it must demonstrate some connection between Erhart and Aurelius in an unlawful scheme. (HT at 29:1–25.) The link must be clear; "innuendo" is insufficient to make the showing. *See 2TheMart*, 140 F.Supp.2d at 1097 (finding that plaintiff's "innuendos of stock manipulation do not suffice to overcome the First Amendment rights of the Internet users").

/ / /

/ / /

/ / /

/ / /

First, several facts relied on by BofI are either neutral or actually support an inference that Aurelius is not part of a conspiracy with Erhart:

(1) As noted by Judge Oetken, Aurelius stated in each of his articles that he was "short" BofI stock. (Oppo. at 2.) It would seem unlikely for Aurelius to make such a proclamation if he were part of a scheme to manipulate the market.

(2) The evidence obtained by BofI purportedly demonstrating that Erhart and his attorney distributed information to known short sellers does not implicate Aurelius. BofI has failed to produce any evidence that Erhart or his attorney sent e-mails or other information to Aurelius.

(3) In an attempt to demonstrate a link without direct evidence, BofI focuses on the timing of Aurelius's articles about BofI, arguing that Aurelius did not begin to write about BofI until after Erhart had filed his complaint and the *New York Times* had published its article regarding BofI. (Decl. of Polly Towill at ¶¶ 19–20.) However, this "timing" does not demonstrate coordination. The "timing" is just as probative of the *New York Times* article being the catalyst for Aurelius's interest in and subsequent investigation of and reporting on BofI.

Second, BofI contends that Aurelius's articles include facts that he could not have known to look for unless Erhart were directing his research. It is this contention that distinguishes the present motion from the one considered by Judge Oetken. In order to provide BofI a full opportunity to develop this contention, at the July 12, 2016, hearing on this matter the Court granted BofI leave to supplement its initial pleading to demonstrate specific instances of Aurelius's disclosure of facts that he would likely have been unable to find without Erhart's assistance. (Court Transcript of July 12, 2016 hearing at 19:22–20:3.) On July 19, 2016, BofI filed supplemental briefing ("Supp. Br.") pointing out a number of different pieces of information relied upon by Aurelius that BofI claims satisfy this standard. (Dkt. No. 21.) BofI argues that the facts discussed by Aurelius with respect to these instances are so specific and difficult to

/ / /

ascertain that Erhart was likely providing the information to Aurelius. Aurelius filed a reply on July 26, 2016. (Dkt. No. 22.) The Court discusses this information below.

*i. FOIA Requests*

According to BofI, Erhart has admitted that he began submitting information to the Securities and Exchange Commission ("SEC") while he still worked for BofI, in an attempt to prompt an investigation. (Supp. Br. at 1.) BofI further states that, shortly thereafter, the SEC began receiving Freedom of Information Act ("FOIA") requests from an individual, whom BofI does not name, seeking information about whether the SEC was investigating BofI. (*Id.* at 1–2.)

BofI's bare assertion that an "unnamed individual" began filing FOIA requests regarding BofI is insufficient to implicate Aurelius. Moreover, BofI's contention that Erhart's attorney had leaked information about BofI to numerous known short-sellers and a *New York Times* investigative journalist before Erhart filed his complaint (Oppo. at 7–9) suggests that it was not Aurelius but one of those short-sellers or the *New York Times* journalist that sought to ascertain whether the SEC was investigating BofI.

*ii. BofI's dealings with OnDeck, Quick Bridge Funding, Center Streeet Lending, Encore Capital and Propel Financial Services*

In a November 10, 2015, blog posting, Aurelius asserted that BofI maintains a clandestine relationship with Quick Bridge Funding ("Quick Bridge"), as well as an overt relationship with OnDeck Capital ("OnDeck"). (Decl. of Polly Towill, Ex. 14.) In the posting, Aurelius documented what he purports is a process in which BofI originates large amounts of loans for OnDeck and then immediately sells the loans back to OnDeck, pocketing the origination fee but bearing none of the risk and keeping the loan off of its own books. (*Id.* at 108–09.)

BofI claims Aurelius would not have had any reason to begin investigating BofI's relationship with OnDeck had he not been tipped off about the relationship by an inside source.

/ / /

In the same post, Aurelius laid out a theory that BofI has a similar arrangement with Quick Bridge. A key distinction with this relationship is that BofI itself finances Quick Bridge's acquisition of the loans that BofI originates. (*Id.* at 109–16.) Aurelius also stated that publicly available bankruptcy records confirm a partnership relationship of some kind between BofI and Quick Bridge. (*Id.*) In addition, Aurelius stated in the posting that Quick Bridge is in fact a subsidiary of Blackrock Lending Group ("Blackrock"), a group that had purportedly been accused by the state of Washington as orchestrating what assertedly amounted to a fraudulent loan scheme. (*Id.* at 110.) On the basis of these various relationships and business practices, Aurelius concluded by warning investors that BofI's business "hardly appears sustainable and also likely includes significant regulatory risks." (*Id.* at 117.)

BofI claims that it is curious that Aurelius would have sought out bankruptcy records regarding Quick Bridge and individuals who defaulted on Quick Bridge loans unless he had been tipped off to do so. (Supp. Br. at 2–3.)

On November 19, 2015, Aurelius penned an article regarding BofI's relationship with a company called Center Street Lending, which Aurelius argued was another company that BofI used to transfer "bad loans" off its balance sheets. (Decl. of Polly Towill, Ex 15.) BofI asserts that because Erhart's personal devices contained detailed information about each loan from BofI to Center Street, the information cited in the posting likely came from Erhart and "would have given Aurelius the building blocks for investigating a Center Street/BofI relationship." (Supp. Br. at 3.)

In a January 6, 2016, article, Aurelius illustrated the connection between BofI and Propel Financial Services ("Propel"), a subsidiary of Encore Capital ("Encore"), which Aurelius alleged is in the business of predatory tax liens. (Decl. of Polly Towill, Ex. 18.) As proof of this relationship, Aurelius pointed out that the Chairman of BofI's Audit Committee is also an executive at Encore. (*Id.* at 182–84.) Aurelius further argues that this relationship culminated in improper and undisclosed financing of Propel by BofI. (*Id.* at 185.) Proof of this transaction with Propel, Aurelius submitted, is

found on a Propel financing statement filed with the Delaware Department of State that lists BofI Federal Bank as a "secured party." (*Id.* at 186–88.)

As an initial matter, the Court notes that BofI does not dispute the facts set forth by Aurelius in the posting, except to state that Aurelius "falsely characterized" the relationship between Quick Bridge and BofI. (*See* Supp. Br. at 2–3.) Rather, BofI argues that the facts in the article could not, or at least would not, have been unearthed unless someone had guided Aurelius to the records, filings, and announcements that form the factual basis for the article. (*Id.*) BofI also asserts that "[i]t is not a coincidence that Erhart's personal devices contained documents that concern the relationship between Blackrock Lending and Quick Bridge." (*Id.* at 3.)

However, BofI has utterly failed to demonstrate that the information relied on by Aurelius could not have been unearthed from basic internet searches without any beforehand knowledge. Although Aurelius is not required to reveal his actual sources, he has set out in some detail how one would likely go about searching for information regarding BofI on the internet and how such basic searches would lead to seemingly obscure information. For example, by using a public California State government website, one can ascertain the liens that a secured party has filed. (Declaration of Kyle Foltyn-Smith at ¶ 3.) Such a search using BofI as the secured party reveals Quick Bridge and Blackrock Lending within the first sixty entries. (*Id.*)

Additionally, given the large amount of information about BofI found on Erhart's personal devices, it appears that almost any information discussed in an article concerning BofI's lending practices would also appear on Erhart's devices. Thus, that the information that appeared in Aurelius's articles was also contained on Erhart's personal devices should not be surprising.

*iii. Private Loans to Individuals*

In the January 6, 2016, posting, Aurelius asserts that BofI financed mortgages for individuals charged with auditing and regulating the bank. (Decl. of Polly Towill, Ex. 18 at 196–198.) These actions were, Aurelius argues, special compensation for those

tasked with ensuring that BofI is properly regulated. (*Id.* at 197.) BofI argues that not only was Erhart a member of BofI's audit department, but that he had improperly accessed employee loan files before absconding in 2015. (Supp. Br. at 4–5.) Furthermore, BofI contends that it is unlikely that Aurelius would have known to search for the employee's mortgages and then taken the time to find names and addresses in the records of the San Diego County Recorder's Office. (*Id.*)

Once again, Aurelius has shown that no tip off was required. An earlier article authored by a different Seeking Alpha contributor had revealed BofI's "insider loan program." (Decl. of Kyle Foltyn-Smith, Ex. D.) The names of the audit committee are public; any mortgages such members have with respect to property in San Diego County can be ascertained by using a search tool provided by the San Diego County Recorder's Office.

*vi. BofI's Structured Settlements*

In the November 10, 2015, blog posting, Aurelius discussed an attempted purchase of a structured settlement by BofI. (Decl. of Polly Towill, Ex. 14 at 117.) BofI had entered into an agreement with the beneficiary to purchase an income stream to be paid between 2021 and 2028 of over a $500,000 for $15,000. (*Id.*) In New York, such arrangements must be approved by a court. In the referenced case, the Suffolk County Court rejected the proposed deal. (*Id.*)

BofI asserts that Aurelius could not have known to search the records of Suffolk County, New York, for a specific case unless he was informed by someone that such a case existed prior to his search. However, Aurelius points out that online tools are available that take the guesswork out of this type of research. Specifically, any investigator interested in ascertaining BofI's experience with lawsuits could have used a free online tool (Justia.com). By typing "BofI Federal Bank" into the search box on the home page of this website, a number of lawsuits involving BofI are returned. The first entry in the list is the decision rejecting the proposed purchase of the structured settlement in the Suffolk County case described in the blog.

In sum, BofI has failed to demonstrate any connection between Erhart and Aurelius. All of the examples cited by BofI of information published by Aurelius are of public information that could have been uncovered by any researcher investigating BofI with the knowledge provided by the *New York Times* article, the Complaint filed by Erhart, and the earlier Seeking Alpha blog post authored by someone else.

**CONCLUSION**

For the foregoing reasons, BofI has not made the showing necessary to overcome Aurelius's right to anonymity as preserved by the First Amendment to the United States Constitution. Therefore, the motion to quash the subpoena served by BofI on CenturyLink is GRANTED.

Date: September 20, 2016

/S/FREDERICK F. MUMM
FREDERICK F. MUMM
United States Magistrate Judge